[No. G043844. Fourth Dist., Div. Three. May 23, 2011.]

In re HANK NGUYEN on Habeas Corpus.

**COUNSEL**

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Julie L. Garland, Assistant Attorney General, Phillip J. Lindsay, Linnea D. Piazza and Michael Rhoads, Deputy Attorneys General, for Appellant State of California.

Brandie Devall, under appointment by the Court of Appeal, for Respondent Hank Nguyen.

**OPINION**

**MOORE, J.**—In 1990, petitioner in the underlying matter, Hank Nguyen, murdered his former girlfriend, Tina Tham, who had broken off their relationship eight months earlier. On June 28, 1991, after the jury convicted Nguyen of murder, the court sentenced him to 15 years to life in state prison.

The Board of Parole Hearings (the Board) found Nguyen suitable for parole in June 2009. The Governor reversed the Board's decision, finding the crime "extraordinar[ily] callous, heinous and atrocious," that Nguyen had not fully accepted responsibility for the murder or developed a sense of genuine remorse.

Nguyen filed a petition for a writ of habeas corpus in the Orange County Superior Court seeking to overturn the Governor's action. The superior court granted the petition after issuing an order to show cause and considering the Attorney General's return and Nguyen's traverse.

Nguyen entered prison with no juvenile or adult criminal record, except the current offense for which he has accepted full responsibility and expressed sincere remorse. In prison, he successfully completed a panoply of courses to strengthen his mind and skills and increase his self-insight. He was discipline

free during his entire incarceration, and kept himself busy working as a plumber and providing math tutoring to other inmates. The Board found Nguyen's institutional behavior "remarkable" and commented it could not "have asked for any more compliance or improvement." Apparently brushing aside Nguyen's accomplishments, the Governor found fault with a mental health evaluator for not exploring more about the cause of defendant's behavior.

It would, of course, have been beneficial to have an in-depth psychological evaluation of why Nguyen had reacted violently to feelings of rejection and being used. All of the Governor's cited reasons for reversing the Board, except for the evaluator's failure to delve deeper into the causes of Nguyen's violence, are belied by the evidence. Nguyen has done an exemplary amount of work to improve himself. He has studied domestic violence, coping mechanisms, anger management and self-improvement. The executive branch's failure to obtain the evaluation, the lack of which caused the Governor concern—a failure that cannot be placed at Nguyen's feet—does not amount to "some evidence" that Nguyen currently poses an unreasonable threat to the public if released from prison. Accordingly, we affirm.

I

FACTS AND PROCEEDINGS

*The Commitment Offense*

We take the following facts about the commitment offense from our 1992 unpublished opinion in Nguyen's appeal from his conviction. (*People v. Nguyen* (Nov. 25, 1992, G011230).) Tina Tham did not show up for work at 11:00 a.m. on October 24, 1990. Tham's roommate, Trang Dang, returned home that evening and heard Tham's television blaring. Hearing no response when she knocked on Tham's door, Dang went outside Tham's bedroom and saw the window was open and a portion of the screen was loose. Dang climbed into the dark room, did not see anyone inside, turned off the television, closed the window, locked the door, and left. At Tham's sister's request, Dang went back into the room again. When Dang turned on the bathroom light she saw Tham's cold, stiff body on the floor. She had been strangled. Police lifted a fingerprint of Nguyen's from the outside of the bedroom window. The day after Tham's death, a police officer contacted Nguyen, who had a bandaged thumb. The officer asked to see the wound. It was a human bitemark.

Eight months before her murder, Tham had broken off the relationship with Nguyen. In the interim, he had "called her incessantly and followed her constantly, sometimes parking in front of her house." He was jealous of anyone she went out with and stubbornly continued in his attempts to reconcile, despite her telling him to leave her alone.

Two of Nguyen's former girlfriends testified to similar patterns of obsessive behavior after they broke off their relationships with Nguyen. One of the former girlfriends, Tam Pham, testified he threatened to kill her when she refused to see him. The brakes on her car failed once and Nguyen told her he had sabotaged them. Nguyen's ex-wife testified he had told her that but for the fact he loved his children, he would choke Pham to death. Hang Luu testified to an occasion when she was dating Nguyen and another man asked her to dance at a nightclub. In the car at the end of the night, Nguyen got angry, held her by the neck, and warned her that he would kill her if she ever left him. When she did break up with him, Nguyen was very angry. He followed her, telephoned her, and appeared at her door unannounced.

The jury found Nguyen guilty of first degree murder. At the time of sentencing on June 28, 1991, the trial judge reduced the offense to second degree murder and sentenced Nguyen to 15 years to life in state prison.

*Initial Parole Consideration Report and Psychiatric Evaluation*

A report signed on November 12, 1999, by two correctional counselors, stated that Nguyen "admits full responsibility for" the murder. Nguyen said he went to Tham's residence, they argued, he accused her of using him, she screamed, he put his hand over her mouth to quiet her, and she bit his thumb. A fight ensued and they ended up on the bed with Nguyen straddling Tham. "The next thing [Nguyen] knew she went limp and had quit screaming." He then took her into the bathroom so she would not be seen, and attempted to make it appear there had been a burglary. The report noted he had no prior criminal history and stated he had joined the Vietnam irregular forces at the age of 15. He joined the Vietnamese Army when he was 18 years old. He acted as an interpreter for recently captured Viet Cong prisoners interviewed for intelligence purposes. He received a Purple Heart and a Bronze Star prior to his medical discharge at the age of 27.

Nguyen has remained discipline free since his reception in state prison. His classification score was the lowest possible for any inmate serving a life sentence.[1] The report stated that Nguyen's "central file reflects an outstanding

[1] "A higher score means the inmate is considered a higher security risk and would be assigned to a correspondingly higher security facility; a lower score means the inmate is

program from arrival into the Department of Corrections until the writing of [the] report, which includes his latest accomplishment of receiving his Associate Certificate in Electronics Technology." Nguyen had a residence and job arranged in the event he would be paroled.

The counselors concluded Nguyen "would pose a low degree of threat to the public at this time if released from prison . . . ." The report recommended Nguyen continue his discipline-free behavior, continue vocational training, and complete an anger management class.

The October 13, 1999 psychiatric evaluation noted Nguyen had no history of substance abuse, that he has "a very excellent support system" with "very viable" postparole plans, and "[h]is prognosis for community living is excellent." The author of the evaluation, Dr. Dennis Payne, assessed the issue of dangerousness as follows: "Currently [Nguyen] does not appear to represent a danger within this institution, and within the community it is felt that he would be safe. Possible risk factors could be again having problems in his relationships with women and developing extreme jealously."

*The April 3, 2008 Parole Hearing*

It appears Nguyen was previously denied parole prior to his April 3, 2008 hearing. His psychological evaluation for the April 2008 hearing indicated the hearing would be Nguyen's "Subsequent Parole Consideration Hearing #3" and on October 27, 2005, parole had been denied for two years. The psychological evaluation prepared by Dr. Barbara P. Stark noted Nguyen "has received numerous laudatory chronos and he has been commended for outstanding participation and efforts" in his therapy and self-help activities. Addressing the issue of insight and self-assessment, the report stated Nguyen "takes full responsibility for his actions in the commitment offense that resulted in the death of the victim with whom he had had a prior six month relationship. It is evident that the inmate does have feelings of sorrow and remorse about this offense. He stated that he was very ignorant of his knowledge of how his feelings of abandonment and rejection affected him and did not fully understand the consequences of his actions at the time. He stated that he does not resent being in prison. He has used his time in a constructive manner as much as he can. He has been able to understand the causes of his violence and today is not the same individual. [¶] He stated that it was not the situation that was the problem; it was his lack of understanding his emotions during the offense, and his anger and hurt, that led to the death

considered a lower security risk and would be assigned to a correspondingly lower security facility." (*In re Jenkins* (2010) 50 Cal.4th 1167, 1171 [116 Cal.Rptr.3d 790, 240 P.3d 260].)

of the victim." After setting forth additional information received from Nguyen, Dr. Stark stated that Nguyen "demonstrated a well developed awareness of the causes that resulted in the death of a human being. He expressed extensive feelings of sadness and guilt." Nguyen was aware that rejection, abandonment, and unrealistic expectations led to his violence.

The report stated there were no current mental health concerns. It also referred to a 2004 psychological assessment wherein Nguyen took "full responsibility for the offense and the 'wrongfulness of his actions'" and "related extensive guilt and remorse." Nguyen's violence potential in the community rated low under the level of service inventory, low under the Psychopathy Checklist-Revised, and low under the historical-clinical-risk management measure. The report concluded: "The inmate has lived for approximately 18 years amongst other inmates, some of them hostile, angry and potentially assaultive. Staff has consisted of females throughout the years. There have been no documented incidents with any females on staff. The fact that he has not been involved in altercations with others demonstrates he has developed appropriate interpersonal social skills and self control. . . ."

The commissioners at Nguyen's April 3, 2008 "Subsequent Parole Consideration" hearing stated his minimum eligible parole date was December 18, 2000. Nguyen was 61 years old at the time of the hearing. When asked about the offense, Nguyen said he had not planned on killing Tham and he "flip[ped] out" when they argued that day. He said he feels "remorse and sad to take a life and not only ruin her family," but also his family. He said he pays for his crime "every day" and that his record shows he has behaved while incarcerated. The commissioners noted Nguyen had no discipline issues while in prison. Nguyen said the murder occurred because feelings of betrayal and anger built up inside him, but that he does not have a problem with women. He claims he is now a different person and knows his weaknesses. He said he should have accepted that he was not what Tham wanted and should have gone on with his own life.

Nguyen was asked how he would, if paroled, handle a situation where he has been in a relationship with a woman and the woman wants to break off the relationship. He said he now understands how he got into trouble; that such a relationship is not important to him anymore. He told the commissioners he could cope with it because he now understands himself, and that he no longer has the problems he had then. Before he could explain how he could cope with such a situation, he was interrupted by one of the commissioners who stated that, because he has been in prison, he has not been in an environment to deal with a similar situation. Nguyen answered that he has

worked with female staff while incarcerated and he has respect for other human beings. He said that he should have accepted Tham's rejection and gone on with his life. He reiterated that although he acted out of anger at his perception of having been used, what happened was not Tham's fault and blame rests solely with him: "I put myself in this problem."

Nguyen attended six years of Narcotics Anonymous (NA) and Alcoholics Anonymous (AA) meetings prior to the April 2008 parole hearing. He also started attending anger management classes in 2008.

*The June 18, 2009 Parole Hearing*

Nguyen filed a petition for a writ of habeas corpus in the Orange County Superior Court (*In re Nguyen* (2009, M-11893)), when he was denied release after his April 2008 hearing. On April 1, 2009, Judge Goethals issued an order that provided in pertinent part: "The petition is granted in so far as petitioner challenges BPH denial of parole. The BPH is directed to hold a new parole suitability hearing within 45 days of this order, and is further directed to find petitioner suitable for parole, unless new evidence, i.e. evidence of behavior occurring subsequent to the April 2008 parole hearing is introduced, which is sufficient to support a finding, the petitioner, currently . . . poses an unreasonable risk of danger to society or a threat to public safety if he were released at this time [citations]."

The Board held another hearing in Nguyen's matter on June 18, 2009. Nguyen's attorney objected to the fact that the hearing was being conducted beyond the 45 days permitted by the superior court's order. The commissioner overruled the objection.[2]

Nguyen presented to the commissioners information on "additional self-help programs" he has participated in and "additional certificates" he has received since the April 2008 hearing. The presiding commissioner read into the record the fact that Nguyen admitted "full responsibility for this offense" as of the February 2005 Board report. The Board further noted Nguyen had

---

[2] The superior court's order directing the Board to hold a new hearing and to grant parole unless evidence of Nguyen's conduct subsequent to his April 2008 hearing is sufficient to support a finding of current dangerousness, and the hearing resulting in the Board granting Nguyen parole occurred prior to the Supreme Court's decision in *In re Prather* (2010) 50 Cal.4th 238 [112 Cal.Rptr.3d 291, 234 P.3d 541]. There, the Supreme Court held that when the Board improperly denies parole, the court should generally "direct the Board to conduct a new parole-suitability hearing in accordance with due process of law and consistent with the decision of the court, and should not place improper limitations on the type of evidence the Board is statutorily obligated to consider." (*Id.* at p. 244.)

no juvenile or adult record other than the murder. He has no history of drug or alcohol abuse. Nguyen's classification was 19 points, the minimum possible for a life prisoner. (See *ante*, fn. 1.) Since April 2008, he has worked as a plumber. As of the time of the hearing, Nguyen had just returned to regular duty after having surgery for colon cancer. The deputy commissioner observed Nguyen had been "very busy" since the April 2008 hearing. He acquired a certificate for his work as a math tutor to other inmates, a certificate for an independent study project "where [he] did eight weeks of life skill training, focused on domestic violence." He received another certificate for "18 independent study projects that included physical wellness, attitudes and beliefs, depression, problem solving, family matter, spirituality and personality, self-worth, human needs and social relationship, child development and parenting, compulsive sexual behavior, grief responding to loss, the con game, family and other relationships, finding your strength, anger, and anger management, two separate classes, and then one on anger, creating new choices, and anger getting rid of resentment." In addition, he received "a number of chronos for other things [he] completed, one was six units, six one-hour unit of self-improvement, strengthening the spirit, and [he] also participated [in] a program, the most excellent way, a Bible based [program] that treats the direct roots, causes of addiction, unstable relationships, and codependency." Additionally, Nguyen took part in an "eight-week workshop on learning inner faith relations and studies . . . [relating] to religious beliefs in a multiracial society." He also "did a six-hour unit of study in self-improvement with the federal bureau or prison residential drug abuse program journal called Recovery Maintenance."

The deputy commissioner observed that in addition to those classes and studies, Nguyen took part in the "Hazelton Program, which is a national recovery program. [He] did a component on guilt. [He] did one on building trust. [He] did one on that focused on grief, perfectionism, one called understanding, one related to handling anger, skills for stress reduction. This was in January 2009, one on shame, one on getting reconnected, improving relationships with yourself and others, a six-hour program that recreated [his] changed plan. It used journaling, and is designed to help [Nguyen] take responsibility for [his] own recovery. [He] did an eight-week . . . domestic violence program, did another program, which was six hours, it's an interactive journal on thinking errors, six hours on coping skills, another six-hour program on living with others, [and] a six-hour program on anger again."

The same commissioner noted Nguyen took other classes in 2008: "finding your strength, getting rid of resentments, one on self-worth, six hours, six hours on the con game, and a six-hour self-improvement program on attitudes

and beliefs, human needs and social relationships. That was six hours. Six hours on problem solving. Six hours child development and parenting skills. Six hours family and other relationship[s]."

Nguyen was asked about attending NA meetings despite the fact he does not have a history of any drug problem. He said he attends the meetings "to hear different people, why they commit their—get deep into the drug, to have no control over themselves . . . . So I went to learn from other people."

The commissioner acknowledged Nguyen's April 2008 psychological report "reiterated the fact that he is in the low range on all the factors . . . ordinarily consider[ed]." The report also indicated Nguyen possessed insight and remorse. In regard to Nguyen's relationship with women, the commissioner stated the psychological report observed Nguyen "has had contact with women over the years when he's in the institution, and is discipline free both in general, but also more particularly there's no evidence that he's had any issues with women since he's been in prison, although he had the opportunity to do so."

A number of family members wrote letters offering Nguyen residences and jobs. Nguyen said his preference was to live with his brother, Dzung, in Anaheim, and to work with him as a boat mechanic in Long Beach. He would work with electronic refrigeration and diesel mechanics. His second choice would be to live with his sister, Yen, in Midway City. If he lived there, he would work for friends at N&H Contractor.[3]

According to Nguyen's attorney at this hearing, the April 2009 order of the superior court relied upon Dr. Stark's conclusion that Nguyen "has come to view his prior mental state and . . . belief system as extremely distorted, and [Nguyen] has developed insight he did not previously have. He had strengthened the internal resources of control, his impulsivity and lack of maturity that were present at the time of the index offense." Nguyen's counsel pointed out that the April 2009 order of the superior court noted Nguyen had at least 11 certificates of completion for self-help programs and that Nguyen's risk for future violence had been assessed by Dr. Stark as being in the low range.

Nguyen expressed remorse for what he did and acknowledged the "major harm" he caused the victim's family as well as his own. He stated his recognition of the fact that he will live the rest of his life with that mistake he made when he acted out, "way, way out," and that he continues to pay for what he did.

---

[3] For purposes of the issues raised in this matter, it suffices to say Nguyen's residence and job prospects, should he be granted parole, were not a concern for the Board or the Governor. Nguyen's family members offered him their residences and jobs.

The commissioners concluded that despite the nature of the offense, Nguyen should be granted parole. The Board found he "no longer pose[s] a risk of danger to society," based upon his positive adjustment while in prison. The Board also noted Nguyen had *no* disciplinary issues while in prison, which was "remarkable."

The Board observed there was some evidence of unsuitability based upon a lack of insight as evidenced by a 1994 psychological evaluation. However, the Board concluded Nguyen's current psychological examination by Dr. Stark contradicted the 1994 report, stating Nguyen " 'takes full responsibility for his actions in the commitment offense that resulted in the death of the victim with whom he had a prior six-month relationship. It's evident [Nguyen] does have feelings of sorrow and remorse about his offense. He stated that he was very ignorant in his knowledge of how his feelings of abandonment and rejection affected him, and did not fully understand the consequences of his actions at the time. He stated he does not resent being in prison.' " With regard to Nguyen's insight, Dr. Stark wrote, " '[Nguyen] stated that it was not the situation that was the problem. It was his lack of understanding of his emotions during the offense . . . .' 'And his anger and hurt that led to the death of the victim. [Nguyen] appears to be quite committed to self-improvement, growth and attainment of wisdom and understanding through his studies and self-help groups. He expressed that he has done self-examination of his relationships with women in the past that culminated in the murder of his former girlfriend. He spoke of his out of control behavior, of his insecurity at the time of the index offense, and his inability to express his feelings of abandonment and rejection in a rational manner that led to his deadly violence. [Nguyen] demonstrated a well developed awareness of the causes that resulted in the death of a human being. He expressed extensive feelings of sadness and guilt. In his own words, "My engineering skills have taught me how to set [up] systems, repair systems, and make technology run smoothly was to find my potential as a human being, and to prepare those broken and failed system within myself." [Nguyen] acknowledges a history of unstable relationships with women prior to the index offense. He stated "I always wanted to please, but whatever I did could not satisfy. Now I know I can only be responsible for my behavior, and I have learned my relationships were sick, and I take responsibility. I know the causes, and I'm aware to be happy by myself first. No one can do that for me, but me." ' "

The commissioners stated there existed a concern that Nguyen's relationships with women had not been evaluated to the extent they would have liked. Still, they concluded parole was appropriate in his case. "On balance,

despite the negative circumstances, which we have fully considered, after weighing all the considerations provided in Title 15 [of the California Code of Regulations], we do find you are suitable for parole because . . . the positive aspects of your case outweigh the other considerations we just discussed, specifically we find that you're suitable for parole based on the following other considerations." Those "other considerations" included Nguyen's remorse and his "remarkable" institutional behavior. One commissioner "found it particularly impressive that you were able to participate in NA I felt [to] not just get the box checked, but to actually take it and see sort of what your version of drugs is, and to use the solutions that you hear in that program. I've never heard anybody articulate that . . . quite that well, and I've seen a number of people who just want . . . the boxes checked. I think the other thing I was impressed with was even after you received your last denial you continued at your same rate of self-improvement, . . . you completed at least 20 classes in the past year, and I was also impressed with the fact that you managed to find the Hazelton Program which is a nationally recognized self-help recovery program that has . . . very good literature, and you certainly went through a substantial amount of . . . what they have available." The deputy commissioner concluded, "In my opinion you really have an exceptional foundation with things you've worked on, combined with . . . your family support, which again you're very fortunate . . . . I do think you would be able, you know, parole to avoid returning to antisocial and criminal behavior."

The commissioners calculated a parole date of 14.333 years based upon the factors in California Code of Regulations, title 15, section 2403, subdivision (c), and noted Nguyen had already served roughly 19 years. The presiding commissioner told Nguyen, "[Y]ou have portrayed yourself in a very exemplary manner while you've been incarcerated, and we couldn't actually have asked for any more compliance or improvement on your part."

*The Governor's Reversal*

On November 12, 2009, the Governor reversed the Board's decision to grant parole. The Governor acknowledged that Nguyen had no prior criminal record and that while he has been confined in state prison he has neither been disciplined nor counseled for misconduct. The Governor also noted Nguyen earned his general equivalency diploma (GED), completed vocational training in a number of areas, and has participated in a number of self-help and life skills courses. However, the Governor considered the murder to have been "especially atrocious" and committed without "regard for [Tham's] life." The Governor also stated his concern that Nguyen "has not fully accepted responsibility for the murder because he has consistently minimized his conduct in the crime over the years and does not express genuine remorse for

his actions." As evidence of these concerns, the Governor cited the fact that the probation report prepared prior to Nguyen's sentencing states that Nguyen said he broke off the relationship with Tham and denied any responsibility for her death.

The Governor's review states Nguyen stopped claiming he did not participate in Tham's death, but continued to minimize his conduct when he told his life prisoner evaluator in 1999 that he went to Tham's house because she wanted to talk to him about doing work on a vacant house and they began arguing. The Governor quoted Nguyen: " 'Tina started screaming and I told her to stop, but she continued to scream. I got scared and panicked because I did not want the police to come. I put my hand over her mouth to make her stop screaming and that is when she bit my thumb. She continued to scream and threw things at me and we started to fight. Tina ended up on the bed with me straddling her. The next thing I knew she went limp and had quit screaming. I opened the window and pushed on the screen to make it look like a burglary. I then left through the front door.' " In 1999, defendant also told his mental health evaluator that " 'he ended up choking her until she stopped screaming, he left her body in the apartment and went back to work without knowing whether she was unconscious or dead.' "

The Governor stated he was "particularly concerned" that at Nguyen's 2008 parole consideration hearing, "the Board expressed concern that 'during this hearing, [Nguyen] spoke only in terms of how this life crime has affected him and his family. He showed little of no remorse for the victim, Ms. Tham [sic],[4] and her family,' " The Governor concluded Nguyen has not accepted full responsibility and has not developed a sense of genuine remorse, making the underlying offense relevant to a determination that Nguyen poses a current unreasonable risk of danger if released.

The Governor further stated Nguyen lacks insight into the "causative factors of his life offense." The review observed that Nguyen discussed with his 2008 mental health evaluator the " 'precursors of the index offense, which included a history of being betrayed by women during his adult life, his feeling of being used over the years in relationships, and then being deserted for another,' " but the Governor found fault with the evaluator for failing "to further explore the more important issue of why Nguyen reacted to these feelings of rejection with such obsessive behavior and extreme violence." The Governor concluded that as of 2008, Nguyen had " 'done little self-help and almost none having to do with any insight as it relates to how he relates with women and why he is violent physically and becomes enraged with they reject him.' "

---

[4] The Governor inserted "[sic]," apparently under the mistaken belief the victim's last name was Pham.

*Habeas Corpus Petition*

Nguyen filed a petition for a writ of habeas corpus in the Orange County Superior Court on December 15, 2009, contending the Governor's reversal of the Board's decision to grant parole was improper and violated due process. The superior court issued an order to show cause, the Attorney General filed a return, and Nguyen thereafter filed a traverse. On May 25, 2010, the superior court issued its order vacating the Governor's reversal of the Board's decision to grant parole and reinstating the Board's grant of parole. In issuing the order, the superior court rejected the Attorney General's contention that the proper remedy, assuming no evidence to support the Governor's reversal, is to remand the matter to the Governor for further consideration.

The Attorney General filed a notice of appeal and petitioned this court for a writ of supersedeas to prevent Nguyen's release pending resolution of the appeal. We summarily denied the petition on July 1, 2010, and the parties state that Nguyen was thereafter released from prison on parole.

## II

## DISCUSSION

■ A Governor's decision granting or denying parole is subject to review by the courts to ensure compliance with due process. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 664 [128 Cal.Rptr.2d 104, 59 P.3d 174].) The Governor's decision is to be based upon the same factors the Board is required to consider. (*Id.* at pp. 625–626; Cal. Const., art. V, § 8, subd. (b) ["The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider."]; see also Pen. Code, § 3041; Cal. Code Regs., tit. 15, §§ 2402 [parole consideration criteria for murders committed after Nov. 8, 1978], 2281 [parole consideration guidelines for life prisoners].) Judicial review of the Governor's decision is limited to a determination of whether the decision is supported by " 'some evidence.' " (*In re Rosenkrantz, supra,* 29 Cal.4th at p. 625.) This standard of review is extremely deferential. (*Id.* at p. 665.)

■ "[T]he fundamental consideration in parole decisions is public safety [citations] . . . ." (*In re Lawrence* (2008) 44 Cal.4th 1181, 1205 [82 Cal.Rptr.3d 169, 190 P.3d 535].) This requires an assessment of the prisoner's *current* dangerousness." (*Ibid.*) Thus, "a reviewing court focuses upon 'some evidence' supporting the core statutory determination that a prisoner remains a *current* threat to public safety—not merely 'some evidence' supporting . . . the Governor's characterization of facts contained in the record." (*In re*

*Prather, supra,* 50 Cal.4th at pp. 251–252, italics added.) Because the Governor reversed the Board's decision to grant Nguyen parole, we are presented with the following question: Is there some evidence Nguyen is currently dangerous and should not be released on parole? We find none.

■ "In determining whether a petitioner is suitable for parole, the Board and the Governor must consider '[a]ll relevant, reliable information.' [Citation.] This information includes the nature of the commitment offense including behavior before, during, and after the crime; the prisoner's social history; mental state; criminal record; attitude towards the crime; and parole plans. [Citation.]" (*In re Gomez* (2010) 190 Cal.App.4th 1291, 1304 [118 Cal.Rptr.3d 900].) "When a court reviews the record for some evidence supporting the Governor's conclusion that a petitioner currently poses an unreasonable risk to public safety, it will affirm the Governor's interpretation of the evidence so long as that interpretation is reasonable and reflects due consideration of all relevant statutory factors. [Citation.]" (*In re Shaputis* (2008) 44 Cal.4th 1241, 1258 [82 Cal.Rptr.3d 213, 190 P.3d 573].)

The Governor reversed the Board's decision to grant parole to Nguyen because, in the Governor's opinion, Nguyen "has not fully accepted responsibility for the murder" and "does not appear to express genuine remorse for his actions." The concern about failure to accept responsibility for the death is based in no small part on the version of the incident Nguyen gave the probation officer who was to prepare the probation and sentencing report immediately after his conviction in 1990. At that time Nguyen denied even being at Tham's residence on the date she died.

Nguyen subsequently admitted Tham's death was completely his fault. At his 2008 parole hearing, Nguyen said he had felt Tham was using him and he used abusive words in talking with her that day. This was an explanation of how he felt at the time of the incident and was not an attempt to foist blame on anyone else for what happened. He admitted the blame was all his. He characterized his actions as having "flipped out" and expressed remorse for taking her life. It is not unusual for a defendant to initially deny culpability, even after conviction, but later come to accept full responsibility for the death he or she caused. (See *In re Gomez, supra,* 190 Cal.App.4th 1291.) In *Gomez,* the petitioner stabbed the victim during a melee at a party and told the probation officer he did not assault anyone with a knife. (*Id.* at p. 1300.) Gomez subsequently admitted he had stabbed the victim. (*Id.* at p. 1298.)

The Governor stated he was "particularly concerned" that as recently as Nguyen's 2008 parole hearing Nguyen spoke only in terms of how the murder affected him and his family at his 2008 parole hearing. That concern is contrary to the record. At the 2008 hearing relied upon by the Governor,

Nguyen expressed remorse for how his actions ruined the lives of *Tham's* family. He reiterated this regret at his 2009 parole hearing when he acknowledged he caused "major harm" to Tham's family as well as his own, and wished it had never happened. Nguyen stated he will live the rest of his life with what he did and that he continues to pay for it.

The Governor's conclusion that Nguyen lacked insight into the factors that caused the murder is also contrary to the evidence in the record. The December 2007 psychological evaluation prepared in anticipation of Nguyen's April 2008 parole hearing concluded Nguyen "demonstrated a *well developed awareness* of the causes that resulted in the death of a human being." (Italics added.) After the Board denied him parole in 2008, Nguyen continued to work at improving his insight. He completed an eight-week course on life skills training focused on domestic abuse, and completed 18 study projects on subjects including "physical wellness, attitudes and beliefs, depression, problem solving, family matter, spirituality and personality, self-worth, human needs and social relationship, child development and parenting, compulsive sexual behavior, grief responding to loss, the con game, family and other relationships, finding your strength, anger, and anger management, two separate classes, and then one on anger, creating new choices, and anger getting rid of resentment." Nguyen also completed studies on unstable relationships and codependency, improving relationships, domestic violence, coping skills, grief, building trust, getting rid of resentment, and multiple courses involving anger management. As the commissioners from his 2009 parole hearing noted, Nguyen's efforts were "exceptional" and the Board could not have asked "for any more compliance or improvement" on his part.

█ "Absent affirmative evidence of a change in the prisoner's demeanor and mental state, the circumstances of the commitment offense may continue to be probative of the prisoner's dangerousness for some time in the future. At some point, however, when there is affirmative evidence, based upon the prisoner's subsequent behavior and current mental state, that the prisoner, if released, would not be dangerous, his or her past offense may no longer realistically constitute a reliable or accurate indicator of the prisoner's current dangerousness." (*In re Lawrence, supra*, 44 Cal.4th at p. 1219.) "Rather, the relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense." (*Id.* at p. 1221.)

The record clearly demonstrates the changes Nguyen made in the more than 18 years since he was delivered to the state prison system. This subsequent behavior, including 18 years without *any* misstep, the lack of any mental health issue, his sincere remorse and "well developed" insight into the

factors that resulted in Tham's death, and his exemplary efforts at self-improvement in all areas, including domestic violence, anger management, and self-awareness render nugatory the circumstances of the underlying offense for purposes of determining Nguyen's current dangerousness. Accordingly, we find there is no evidence to support the Governor's reversal of the Board's decision to grant Nguyen parole.

■ The fault the Governor found with the 2008 mental health evaluator in failing "to further explore the more important issue of why Nguyen reacted to these feelings of rejection with such obsessive behavior and extreme violence" does not supply the missing evidence of dangerousness. The evaluator found insight. At best, the failure to follow up with further questioning is a perceived shortcoming on the evaluator's part. The lack of evidence concerning dangerousness is not evidence of dangerousness. Moreover, as we noted above, the perceived failure of the evaluator cannot be laid at defendant's feet. He has no control over what questions are asked; he answers the questions that are asked.

There remains the issue of the proper remedy. Nguyen argues the appropriate remedy is to reinstate the Board's decision, which set a parole date that lapsed six years ago. The Attorney General, relying upon the decision in *In re Prather, supra*, 50 Cal.4th 238, contends that the matter should be remanded to the Governor to proceed in accordance with due process.[5] We find the appropriate remedy is to reinstate the Board's decision.

In *Prather*, the Supreme Court held that when a court finds the Board's decision to deny parole is not supported by some evidence, the court granting relief to the petitioner "generally should direct the Board to conduct a new parole-suitability hearing in accordance with due process of law and consistent with the decision of the court . . . ." (*In re Prather, supra*, 50 Cal.4th at p. 244.) The court stressed that it was considering "the limited procedural question of the proper scope of the decision of a reviewing court that concludes the *Board* has abused its discretion in denying a prisoner a parole date." (*Ibid.*, italics added.) On the other hand, in *In re Lawrence, supra*, 44 Cal.4th 1181, where the court found the Governor denied the petitioner due process by vacating the Board's grant of parole, the court did not remand the matter to the Governor for further proceedings. It affirmed the Court of Appeal's decision reinstating the Board's grant of parole. (*Id.* at p. 1190.)

---

[5] Since Governor Schwarzenegger vacated the Board's grant of parole in this matter, Edmund G. Brown, Jr., has assumed the office of Governor upon his election.

## III

## DISPOSITION

The judgment of the superior court vacating the Governor's decision reversing the Board's grant of parole and reinstating the Board's decision granting parole is affirmed.

Bedsworth, Acting P. J., and O'Leary, J., concurred.