Filed 12/4/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re | B253193 |
| | (Super. Ct. No. BH009082) |
| ROBERT G. BUTLER, | |
| on Habeas Corpus. | |

 

ORIGINAL PROCEEDING.  Petition for a writ of habeas corpus.  William C. Ryan, Judge.  Petition granted.  Judgment reversed.


Michael Satris, under appointment by the Court of Appeal, for Respondent.


Kamala D. Harris, Attorneys General, Jennifer A. Neill, Assistant Attorney General, Sara J. Roman and Kathleen R. Walton, Deputy Attorneys General, for Petitioner and Appellant.


_____

The Warden of Folsom State Prison appeals from the trial court order granting inmate Robert G. Butler's habeas corpus petition to overturn the Governor's denial of Butler's release after the Board of Prison Terms' decision to parole Butler after 27 years in state prison for a double homicide. We agree with the Warden that the Governor did not improperly rely on new evidence from outside the administrative record and that some evidence supports the Governor's decision. We therefore reverse the judgment granting Butler's habeas petition. The effect of our decision is to reinstate the Governor's decision denying release.

## FACTS AND PROCEDURAL HISTORY

A.    *The Crimes*

In December 1985 Robert G. Butler shot and killed Robert Jones, 47, and Ronald McClendon, 17, inside Jones's house. Each had been shot twice at close range while sleeping. Jones was shot while in his bed and McClendon was shot while on a living room sofa.

Butler was 22 at the time and a nationally ranked track and field star attending Azusa Pacific College. Jones was his former high school teacher. Butler had been living with his uncle while in high school but Jones took Butler in after a dispute arose because the uncle was unhappy with Butler's decision to become a cadet with the Arcadia police department. Butler had lived with Jones for three years. Butler's mother abandoned him when he was very young and he was raised by an alcoholic and emotionally distant father. Butler viewed Jones as a surrogate father figure and maintained a room in Jones's house even after he left for college. Butler had no criminal record and by all accounts was considered a bright and promising young man headed toward a career in law enforcement.

Unbeknownst to Butler, Jones was gay and, according to Butler, had made several sexual advances over the years, although Butler did not recognize them as such until he learned about Jones's sexual orientation shortly before killing him. Butler said he also

2

learned about a week before the crime that ten years earlier Jones molested Butler's older brother, who was 13 at the time. Butler claimed he learned this from William Alton, who once lived with Jones and was also McClendon's cousin.

After learning that Jones had molested his brother some years earlier, Butler went to confront him and demand an apology. Butler was also upset because he believed Jones had grown distant and aloof with him. Butler used his house key to enter and went to Jones's bedroom. Jones refused to apologize and told Butler, "I don't owe you shit. Get the fuck out." Butler left the bedroom and retrieved a handgun that he knew Jones kept hidden in the house. Butler returned to Jones's bedroom and shot him twice as he slept.

As Butler walked into the living room on his way out of the house, he claims he heard a rustling or shifting type noise coming from the sofa, and fired twice at close range. What he heard was McClendon pulling the covers over his head. Butler fled, leaving behind his scarf. He also left behind his set of keys in the bedroom he still maintained at Jones's house.

Butler pleaded guilty to two counts of first degree murder and in July 1986 began serving two concurrent terms of 27 years to life.

B.  *Prison Performance Record*

Butler earned a bachelor's degree in Social Science and a Master's Degree in Community Health Administration while in prison. He also became a licensed x-ray technician and completed vocational training in both drafting and office services. He worked in the prison's print plant, held a variety of clerk's jobs, and worked in a prison program to help inmates with developmental disabilities. His prison work record was considered exemplary.

Butler also completed numerous therapy and self-help programs to help him understand what drove him to kill. He also became a Buddhist to help him achieve peace and understanding. The only black mark on Butler's prison record was a 1999 incident involving mutual combat.

3

C.     *Parole Board History*

The Board of Prison Terms (the Board) denied Butler parole in 2002, 2005, and 2009. At the 2009 hearing he testified that he killed Jones as a way of acting out years of suppressed anger at his abandonment by his mother and the emotional distance of his father, triggered by his perception that surrogate father figure Jones was also abandoning him. He did not see McClendon but shot out of fear and reflex, although he took responsibility for his actions, expressed remorse, and recognized the damage he had inflicted. Butler was considered to be at low risk of violence or recidivism.

The Board denied parole in 2009 because it found Butler's explanation for killing Jones inexplicable as a reaction to the slight directed at Butler. The Board also disbelieved Butler's version of events concerning the McClendon slaying. First, the evidence showed he would have walked past the living room where McClendon slept at least twice before shooting him, making it unlikely Butler was unaware of his presence. Second, Alton told the police that McClendon had complained to him that Butler was returning to Jones's house with his things. Alton told McClendon to sleep on the sofa because Butler was jealous of other people using his room. Alton never mentioned to the police that he had inadvertently supplied a motive for murder by telling Butler that Jones had molested his brother. All told, these factors led the Board to conclude that despite Butler's tremendous progress he still lacked insight into what really happened and his true motivations for the crimes.

At his 2012 parole hearing Butler repeated his earlier explanations for the crimes: that he acted out of years of suppressed anger due to his parental abandonment, fueled by what he viewed as abandonment by Jones. According to Butler, Jones had recently admitted he was gay at about the same time Butler was entering his first serious relationship with a girl. Butler then began to see his relationship with Jones in a new, disturbing light, followed soon after by the revelation that Jones had molested Butler's older brother several years earlier. He felt deceived and betrayed. Instead of the apology he needed, Jones rebuffed him, causing Butler to snap.

4

As for McClendon, Butler did not expect anyone to be sleeping on the sofa. He now understood that the noise he heard was McClendon pulling the blanket over his head in order to hide, but he interpreted that as an impediment to escaping, so he aimed and shot twice. Butler made no excuses for his conduct, said his actions were intentional, and that despite his preexisting emotional issues, it was still a horrible decision made by him without regard to the consequences. He viewed his actions as deliberate, apologized to the victims' families, and said that although he could not make amends for his actions, he hoped to someday do something that somebody would be proud of. He also expressed increased remorse for killing McClendon, who had nothing to do with the circumstances and was killed due to Butler's selfish rage.

Butler's 2012 psychological evaluation again found no indication of mental or personality disorders and concluded he posed a low risk of violence. A risk assessment found that Butler had true insight into the causes of his crimes and expressed sincere remorse. If paroled, Butler had been accepted into Coronado Stone Products, a 14-month transitional assistance program where he could live and work. He had been accepted as a volunteer at the Pasadena Humane Society, and had back-up transitional housing in the PREP program. He had potential job opportunities with a pool service and a gas station. He also had a strong support network of family and friends waiting for him.

The Board found that Butler was suitable for parole. The aggravating circumstances of his crimes were "far outweighed" by other circumstances, the Board found. These included the lack of a juvenile or adult criminal history, a stable social history, an exemplary life up to the time of the crime and while incarcerated, and his assumption of full responsibility for his crimes. The Board pointed to Butler's numerous activities and achievements while in prison, stating, "It's just overwhelming. And it's not just the amount . . . of work you've done . . . [b]ut what you have achieved from it, what you have been able to verbalize here today is what sets you apart from everybody else."

The Board found that Butler had demonstrated sincere and "exceptional remorse." Butler not only took full responsibility for his actions, but his thoughts and words "demonstrated a level of empathy and contrition that only somebody with so many years

5

of reflection can express in a hearing." Most important, the Board applauded Butler's insight into what led to the murders, showing "with words how insight can be expressed with respect to how your upbringing, how this crime came to be, with your childhood, how it evolved from the crime itself, and where you are today." The Board believed that Butler "did an exceptional job with respect to insight, and your understanding, and the factors, the triggers, . . . the causative factors . . . . They weren't just word that you spit out into key words. They were thoughtful, thought-provoking, detailed and were expressed [in a way that] sheds light on how much work you've done over the years."

In sum, the Board found "beyond adequacy" that Butler demonstrated he was no longer a threat to society and that there exists no nexus between either past and future criminality and the man he was to the man he is today.

D.    *The Governor's Parole Reversal*

After recounting the facts of the crime and taking note of Butler's many positive achievements while incarcerated, the Governor's written decision gave the following reasons for reversing the grant of parole:

"Mr. Butler committed a senseless and truly reprehensible double-murder. He executed Mr. Jones in his sleep and then coldly killed Mr. McClendon as he hid behind his covers. Mr. McClendon was a promising young student and track and field athlete with his whole life ahead of him. Mr. Butler's actions devastated the lives of the victims' families and friends and had a long-lasting impact on the community. I note that Mr. McClendon's family members have written me numerous heartfelt letters after the Board granted Mr. Butler's parole urging me to reverse the Board's decision.

"From the evidence, it seems reasonably clear that Mr. Butler is not revealing his actual state of mind that led up to his brutal execution-style murders of Mr. Jones and Mr. McClendon, or he doesn't understand the dynamics underlying his behavior. At his 2009 Board and 2012 psychological evaluation, Mr. Butler stated that he killed Mr. Jones because of his 'emotional immaturity' rooted in his mother's abandonment of the family when he was two years old. This feeling of abandonment, he claims, 'led me to write an

6

emotional life script of parental reconciliation' in which he sought affection and attention from parental figures, including Mr. Jones. He told the psychologist he felt deceived and rejected by Mr. Jones, and was 'attempting to process the grief over the end of my parental-child relationship with Robert Jones.'

"I find Mr. Butler's explanations for why he murdered Mr. Jones incomprehensible. Emotional immaturity and anger over his mother's abandonment twenty years prior do not adequately explain why Mr. Butler would react with such extreme violence over Mr. Jones's rejection of him. According to the 2009 transcript, Mr. Butler felt rejected because Mr. Jones 'used to bake him cookies and write him at school and he stopped doing that.' There are clearly deeper, unexplored or unexplained reasons that would drive a twenty-two year old man to kill two people in premeditation merely because he was getting the cold shoulder from a father figure.

"Mr. Butler's explanation of how he murdered Mr. McClendon is also unconvincing. Mr. Butler told the Board in 2012 that he did not know Ronald McClendon and was not aware that anyone was sleeping on the couch in the living room. He claims that as he tried to leave the house, he heard the sound of Mr. McClendon pulling the blanket over his head and reacted, shooting him. However, Mr. McClendon was shot twice, at close range. I find it hard to believe that Mr. Butler was only reacting to the sound of a shifting blanket when he shot Mr. McClendon not once, but two times from only a few feet away. Furthermore, Mr. Butler's scarf was found in the kitchen and his keys were found in his old bedroom. As the 2009 Board pointed out, Mr. Butler would have had to walk by the couch several times to leave his belongings in these different rooms, and somehow fail to realize that Mr. McClendon was on the couch.

"I am also concerned by new information brought to my attention by the Los Angeles County District Attorney's Office and by Mr. McClendon's brother in letters to me following the Board's grant of parole. Enclosed in these letters are declarations from Gene McClendon, the brother of murder victim Ronald McClendon, and William Alton,

7

a former friend of Mr. Butler's and cousin to the McClendons.[1]  Both declarations aver that the McClendon brothers had known Mr. Butler for four years prior to the murders, and had socialized on numerous occasions with Mr. Butler at track meets and family dinners.  Mr. Alton also states that he spoke to Mr. McClendon on the night of the murder and that Mr. McClendon told him:  'Rob [Butler] was tripping me about sleeping in his room and said he [Butler] 'didn't want me sleeping in his room anymore.' "[2]  If this information is true, it is troubling that Mr. Butler would deny even knowing who Ronald McClendon was and deny knowing that Mr. McClendon was staying at Mr. Jones's house for several weeks.

"Mr. Alton's declaration also states unequivocally that he never had a conversation with Mr. Butler in which he conveyed that Mr. Jones had molested Mr. Butler's brother, William.  This statement directly contradicts Mr. Butler's testimony in 2009 that a week before the murders, William Alton visited him at college and told him, 'You know, Robert Jones bragged to me about turning your brother out when your brother was in junior high school.'  According to Mr. Butler, it was Mr. Alton's revelation that prompted him to confront Mr. Jones.  This new information, if true, raises serious questions about Mr. Butler's motivations for killing Mr. Jones and Mr. McClendon.

"It is imperative that the Board give full consideration to this information and provide Mr. Butler with an opportunity to respond at his next suitability hearing."

---

**1**    For reasons that are not clear from the record, the victims' families did not receive notice of any of the parole hearings and therefore did not have the opportunity to oppose Butler's release.  Instead, they learned after the 2012 hearing that Butler had been paroled, prompting their letters to the Governor.

**2**    [The Governor inserted a footnote at this point, which read:]  "This statement appears to be corroborated by Mr. Alton's interview with police on December 31, 1985, in which he conveyed that Mr. McClendon had called him on the night of the murders to say, 'Robbie [Butler] is coming home from school and bringing his stuff home.'  Mr. Alton told police that 'Robbie is jealous of other people using his (Robbie's) room, and to avoid trouble, just to have McClendon sleep on the sofa and he would be over later in the week and talk to Robbie.'"

The Governor concluded by stating: "I have considered the evidence in the record that is relevant to whether Mr. Butler is currently dangerous. When considered as a whole, I find the evidence I have discussed shows why he currently poses a danger to society if released from prison. Therefore, I reverse the decision to parole Mr. Butler."

E.    *The Trial Court Grants Butler's Habeas Petition*

Butler filed a habeas corpus petition with the trial court in order to overturn the Governor's decision to veto his parole. The trial court granted that petition on two grounds: (1) the Governor was not allowed to rely on the new declarations; and (2) the remaining evidence did not show some evidence of current dangerousness. As to the latter ground, the trial court made the following findings: (1) The Governor's claim that Butler lacked insight into the causes of his crimes was based on a superficial and out of context statement by Butler that ignored a much larger body of evidence that Butler in fact possessed insight, demonstrated remorse, and did not minimize his crimes; and (2) Butler's version of how and why he shot at McClendon was not sufficient reason to reverse parole simply because the Governor had a different take on the evidence. Butler's account did not have to square with the official record so long as his version was plausible and he accepted full responsibility for the crimes. The trial court found that the Governor erred because Butler met these standards, and because the Governor failed to show a nexus between the factual discrepancies and a risk of current dangerousness.

**DISCUSSION**

1.    *The Law Applicable to Reversing A Grant of Parole*

The Board is the executive branch administrative agency with the statutory authority to grant parole. (*In re Lawrence* (2008) 44 Cal.4th 1181, 1201 (*Lawrence*).) A release date must be set unless the Board determines that public safety requires further incarceration. (Pen. Code, § 3041, subd. (b); *Lawrence* at p. 1202.)[3] Under Article V,

_____

**3**     All further undesignated section references are to the Penal Code.

section 8, subdivision (b) of the California Constitution, the Governor has the authority to reverse the Board's grant of parole based on the same factors that the Board must consider. If the Governor does so, he must send "a written statement to the inmate specifying the reasons for his or her decision." (§ 3041.2, subd. (b).)

The Governor's decision to reverse a grant of parole is subject to judicial review. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 664 (*Rosenkrantz*).) We review the Governor's decision under the highly deferential "some evidence" standard to determine whether a modicum of evidence supports a finding that the inmate poses a current risk of danger to the public. (*In re Shaputis* (2011) 53 Cal.4th 192, 210, 213, 221 (*Shaputis*).) Our review is not confined to the evidence cited by the Governor but instead extends to the entire record. (*Id.* at p. 214, fn. 11.) The executive decision of the Governor is upheld unless it is arbitrary or procedurally flawed. We do not ask whether the inmate is currently dangerous because that question is reserved to the executive branch. Instead, we consider whether there is a rational nexus between the evidence and the ultimate determination that the inmate is still dangerous. We may not reweigh the evidence. (*Id.* at p. 221.) This highly deferential standard of some evidence is designed to guard against arbitrary parole decisions without encroaching on the executive branch's broad authority. (*Ibid.*)

2. *The Governor Did Not Rely on New Evidence*

Pursuant to constitutional and statutory authority, the Governor may reverse a parole grant "on the basis of the same factors" that the Board must consider (Cal. Const., art. V, § 8), and "shall review materials provided by" the Board. (§ 3041.2, subd. (a).) Beginning with *In re Arafiles* (1992) 6 Cal.App.4th 1467, 1477 (*Arafiles*), several Courts of Appeal have interpreted these provisions to mean that the Governor's review is confined to the evidence that had been before the Board, and that he may not rely on new evidence when reversing a parole decision. (*In re Copley* (2011) 196 Cal.App.4th 427, 433; *In re Gray* (2007) 151 Cal.App.4th 379, 402; *In re Scott* (2005) 133 Cal.App.4th 573, 603; *In re Smith* (2003) 109 Cal.App.4th 489, 507 (*Smith*).)

10

Butler contended, and the trial court agreed, that the Governor violated this rule when he cited the declarations of Alton and Gene McClendon in his written decision overturning the Board. Respondent contends that we should decline to follow these decisions either because they misinterpreted the applicable constitutional and statutory provisions concerning the materials the Governor must consider or because they are factually distinguishable, primarily because the new materials at issue in those cases consisted of opinions concerning the inmate's suitability for release.[4] Respondent alternatively contends that even if the Governor was not allowed to rely on the new declarations, the remaining evidence that is not in dispute was sufficient to support his decision.

Although our Supreme Court has never expressly ruled on this issue, the *Rosenkrantz* court cited *Arafiles* for the proposition that the Governor's decision must be based on the same factors as the Board. The cited pages included *Arafile's* analysis of why "factors" means the same evidence that was before the Board. (*Rosenkrantz, supra,* 29 Cal.4th at p. 660, citing *Arafiles, supra,* 6 Cal.App.4th at pages 1478-1479.) *Rosenkrantz* later stated, without citation, that when courts review the Governor's decision to reverse a parole grant, that review determines whether "the factual basis of such a decision *is supported by some evidence in the record that was before the Board.*" (*Rosenkrantz* at p. 667, italics added.)

Furthermore, contrary to respondent's assertion that the "no new evidence" decisions listed above concerned only personal opinions and not actual evidence, the

---

**4** Respondent contends that *In re Ross* (2010) 185 Cal.App.4th 636, stands for the proposition that the Governor may consider new evidence. As the same court later made clear in *In re Copley, supra,* 196 Cal.App.4th at page 434, *Ross* was limited to the circumstance where the Governor's decision to reverse a parole grant was overturned on appeal and remanded in order to comply with the command in *Lawrence, supra,* 44 Cal.4th 1181, that the Governor articulate a rational nexus between the Governor's findings and the inmate's current dangerousness. The matter went back to the Board for another parole hearing, and then made its way to the Governor again, along with some new evidence. *Ross* did not apply outside that scenario and the Governor is ordinarily limited to considering only the evidence that has been before the Board. (*Copley,* at pp. 433-435.)

11

court in *Smith, supra,* 109 Cal.App.4th at pp. 499, 505, held that the Governor could not consider a post-parole Board hearing letter from the sheriff's department that contained factual assertions contradicting the inmate's version of events.[5]

Based on this, it appears that the trial court was correct when it determined that the Governor could not rely on new evidence. Even though the trial court was correct on that score, we conclude that the trial court erred because the Governor did not rely on the new declarations.

When discussing the new declarations, the Governor said he was "concerned by new *information.*" (Italics added.) After setting forth the contents of those declarations, the Governor said that this information was "troubling" and "raises serious questions" *if it were true*. The Governor said the Board must fully consider this information and give Butler an opportunity to respond at his next parole hearing.

When discussing the matters he relied upon that had been before the Board, the Governor referred to the "evidence" that led him to *find* that Butler's explanations were incomprehensible, that his explanations were "unconvincing," and that he "find[s] it hard to believe" Butler's version of events concerning why he shot McClendon. The Governor concluded by finding that this evidence showed Butler was still dangerous.

In short, the Governor differentiated between evidence, upon which he based his findings, and new information, as to which he made no findings, leaving those matters for the Board at a future parole hearing. Therefore, the Governor did not rely on the new declarations – he merely highlighted them as areas of concern that the Board had to resolve at a future hearing where Butler would have a chance to respond, thereby showing the Governor's awareness that he could not base his decision on the new materials. As a result, the trial court erred by finding that the Governor violated the rule against considering new evidence when he reversed the Board.

---

**5**      We further note that review was denied in *Smith, supra,* 109 Cal.App.4th 489, while it does not appear that review was sought in the other decisions holding that the Governor may not go outside the evidentiary record before the Board.

12

3.     *Some Evidence Supports the Governor's Decision*

The Governor overturned the Board's parole grant for the following reasons: (1) the murders were committed execution-style, and were brutal and reprehensible; (2) Butler was not revealing his true state of mind or did not understand the dynamics that motivated him, because his lifetime feelings of maternal abandonment did not explain why he acted out with such rage when Jones rejected him; and (3) Butler's contention that he shot McClendon out of reflexive panic was not convincing because the evidence showed the shots were fired at close range and that Butler must have known McClendon was on the sofa.

Although the severity of the offense by itself was once sufficient reason to deny parole, since the decision in *Lawrence, supra,* 44 Cal.4th 1181, the parole authority must also show that the circumstances of the offense demonstrate that the inmate still poses an unreasonable risk to public safety. (*Shaputis, supra,* 53 Cal.4th at p. 217.) The inmate's failure to gain insight into his criminal behavior will support the denial of parole based on the circumstances of the offense so long as it is rationally indicative of the inmate's current dangerousness. (*Id.* at pp. 217-219.) This includes the inmate's understanding of the crime and the reasons it occurred. (*Id.* at p. 220.)

Butler contends the Governor's decision was unsound because the Governor has simply ignored the unanimous psychological determinations, along with the Board's finding, that he does in fact have great insight into his crimes. Butler cites several decisions for the proposition that the Governor acted on nothing more than a speculative hunch or feeling that Butler lacked insight: *In re Nguyen* (2011) 195 Cal.App.4th 1020; *In re Dannenberg* (2009) 173 Cal.App.4th 237; *In re Vasquez* (2009) 170 Cal.App.4th 370; *In re Singler* (2008) 169 Cal.App.4th 1227; and *In re Roderick* (2007) 154 Cal.App.4th 242. Each is distinguishable because none concerned one of the key factors underlying the Governor's decision – the finding that the defendant's version of what happened was not credible.

13

Butler also cites *In re Palermo* (2009) 171 Cal.App.4th 1096, 1112 (*Palermo*), disapproved on another ground in *In re Prather* (2010) 50 Cal.4th 238, 252, and two decisions that followed it for the proposition that an inmate's version of events need not hew to the official version of what happened, and that a mere inconsistency is not enough to sustain a lack of insight finding unless the inmate's version is either inherently impossible or strains credulity because it is delusional, dishonest, or irrational.  (See also *In re Twinn* (2010) 190 Cal.App.4th 447, 466-467; *In re Moses* (2010) 182 Cal.App.4th 1279, 1307-1308, 1310.)  Butler contends that his version of events concerning the shooting of McClendon is not inherently improbable and does not strain credulity because it is entirely possible that he entered a darkened house that he knew quite well and never saw McClendon before shooting him.

This contention takes us back to *Shaputis, supra,* 53 Cal.4th at pages 214-214, and its holding that we must view the record in the light most favorable to the parole authority's decision and that we may not interfere when the parole authority declines to believe certain evidence unless its determination lacks any rational basis and is merely arbitrary.  *Palermo* and its progeny seem inconsistent with this rule.  (*In re Tapia* (2012) 207 Cal.App.4th 1104, 1113 [*Shaputis* calls *Palermo* into question].)  Under *Shaputis*, our inquiry is limited to whether some evidence in the entire record supports the Governor's determination that Butler's version of events is at odds with the facts, and that there is a rational nexus between that disparity and a finding that Butler is currently dangerous.

Although Butler told the Board that he took full responsibility for shooting McClendon, he still maintained that his action was one of unthinking panic, that he did not know McClendon, and that he did not even know someone was sleeping on the sofa.  However, when interviewed by the police in December 1985, Butler said that after shooting Jones "he went back into the bedroom . . . and shot the young man who lay asleep on the couch."  He offered no reason for doing so, but claimed he "wasn't even certain who the young man was."  A 2002 parole hearing "Life Prisoner Evaluation" recounted Butler's version of events.  Butler said that after shooting Jones he "went into

14

the living room where he fired two shots into Victim McClendon.  McClendon was viewed as a collaborator with Jones and, perhaps, Butler says, his co-dependent nature found Butler wanting to be McClendon . . . on the inside looking out instead of betrayed and on the outside looking in."

These statements say nothing about a panicked shooting toward the sound of movement coming from the sofa as Butler tried to hurriedly leave Jones's house.  The second statement sounds as if Butler knew who McClendon was and bore a jealous grudge against him.  Both sound as if the shooting was intentional.  Furthermore, the forensic evidence detailed in police reports showed that gunshot residue was found on the blankets of both victims, meaning they were shot at very close range.

Therefore, even under the "strained credulity" standard, Butler's contention that he did not know McClendon was on the sofa and fired in a panic at the sound of McClendon pulling the covers up is inconsistent.  Such inconsistency "reflects on [Butler's] credibility, and indicates a refusal to admit the truth to himself and to others.  This establishes a nexus to current dangerousness because it indicates the inmate is hiding the truth and has not been rehabilitated sufficiently to be safe in society."  (*In re Pugh* (2012) 205 Cal.App.4th 260, 273 [holding that no evidence supported Governor's parole reversal where Governor found facts of second degree murder could have supported first degree murder; jury's conviction of second degree murder rebutted that claim, and other claimed inconsistencies were not supported by the record].)

While we acknowledge Butler's significant efforts over the years to gain insight into his crimes and demonstrate his remorse and ability to safely blend back into society, "it is irrelevant . . . that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole."  (*Rosenkrantz, supra,* 29 Cal.4th at p. 677.)  Instead we may reverse the decision "[o]nly when the evidence reflecting the inmate's present risk to public safety leads to but one conclusion," because only then is the denial of parole arbitrary and capricious.  (*Shaputis, supra,* 53 Cal.4th at p. 211.)  Because some evidence exists to support the Governor's decision, we conclude that the trial court erred by finding otherwise.

15

4.      *The Governor's Statement of Reasons Was Not Defective*

The Governor and the Board must consider several suitability factors specified by both statute and administrative regulations.  (*In re Prather, supra,* 50 Cal.4th at p. 251.)  These are:  the absence of a juvenile record; reasonably stable relationships with others; signs of remorse; a crime committed due to significant stress; battered woman syndrome; the lack of any significant history of violent crime; the inmate's present age reduces the chance of recidivism; the inmate has made realistic plans for release or has developed marketable skills that can be put to use upon release; and the inmate's institutional activities indicate an enhanced ability to function within the law upon release.  (Cal. Code Regs., tit. 15, § 2402, subd. (d).)

So long as the parole decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, our review is limited to determining whether some evidence in the record supports the decision.  (*Shaputis, supra,* 53 Cal.4th at p. 210.)

Butler contends that even if some evidence supports the Governor's decision, we should affirm because that decision reflects individualized consideration of only three factors – his educational achievements, vocational training, and self-help programming.  We disagree.  As Butler concedes, the introductory portion of the Governor's written decision recounted all the required factors.  Butler finds fault because the decision did not go on to discuss and analyze all of them.  However, the Governor said he had considered the evidence in the record that was relevant to whether Butler was currently dangerous, and we have no reason to doubt that statement.  (*In re LeBlanc* (2014) 226 Cal.App.4th 452, 458.)

5.      *The Gubernatorial Review Process Is Not An Ex Post Facto Violation*

The constitutional provision that gave the Governor the power to overturn the Board's decision to grant parole came into being after Butler was convicted.  He contends this increased his potential punishment and therefore violated the constitutional

16

prohibition against ex post facto laws.  He cites no authority for this proposition but instead "incorporates into his argument" the findings of fact and evidence from *Gilman v. Brown,* an unpublished 2014 decision of the United States District Court.  Respondent views this as an improper attempt to augment the record but otherwise does not address Butler's claim.

The *Rosenkrantz* court has already addressed this issue and held that the gubernatorial parole review procedure does not violate ex post facto principles. (*Rosenkrantz, supra,* 29 Cal.4th at pp. 639-640.)  We therefore reject Butler's ex post facto argument.

## DISPOSITION

The judgment granting Butler's habeas corpus petition is reversed and the Governor's decision overturning the Board's grant of parole is reinstated.


                                                    RUBIN, ACTING P. J.
WE CONCUR:



        FLIER, J.



        GRIMES, J.


17