Filed 9/11/14  In re Jackson CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re GREGG H. JACKSON,<br><br>on Habeas Corpus. | A138891<br><br>(San Francisco City & County<br>Super. Ct. No. 127142) |

In June 1988, petitioner Gregg H. Jackson received an indeterminate sentence of 15 years to life after pleading guilty to second degree murder with use of a weapon and during a robbery.  At his sixth parole hearing held in July 2012, the Board of Parole Hearings (Board) found Jackson suitable for parole.  The Governor reversed the Board's decision in December, and Jackson filed a petition for habeas corpus in the superior court challenging the Governor's decision, which was denied.

Jackson filed the instant petition for writ of habeas corpus in this court in propria persona.  We requested that the Attorney General (AG) submit an informal written response (see Cal. Rules of Court, rule 8.385(b)(1)), and thereafter issued an order to show cause (OSC) and ordered appointment of counsel.  The AG, accordingly, filed a return, and Jackson filed a traverse.  Following oral argument,[1] we took the matter under submission, ordered the AG to file the entire file before the Board and Governor, vacated submission, and allowed supplemental briefing.  We now grant Jackson's petition for habeas corpus.

---

[1] Neither party requested oral argument, and we ordered it sua sponte, asking the parties specifically to address the scope of appellate review and whether the Governor's decision was supported by a modicum of evidence in the record.

1

## A. *Commitment Offense*

The probation report prepared in connection with Jackson's June 1988 sentencing hearing stated as follows: "Twenty-one-year-old Gregg H. Jackson is appearing before the Court after having entered a plea of guilty to violation of sections 187 PC (Murder) with the Admission of the Use of a Weapon per 12022(b) PC, and 212.5(a) PC (Robbery). Between August 3rd and August 5, 1987 the defendant robbed and murdered Shirley Toliver. He admitted to the use of a hammer in the commission of the murder. [¶] Considering the nature of the instant offense, the defendant clearly is not a candidate for probation. In his favor, it should be noted that he has no known prior criminal record, and he cooperated with the criminal justice system by pleading guilty in Municipal Court. The defendant said that at the time of the instant offense he was under the influence of speed. [¶] He stated that he had little experience with drugs, but had begun using speed approximately two weeks before this incident. He said that he was awake for approximately a week snorting speed when he became involved in this robbery and murder."

## B. *Governor's Decision Reversing Parole Decision*

On release review, the Governor reversed the Parole Board's decision to grant parole. We discuss the Board's decision in detail below, but note here, its decision results in Jackson's immediate release, given the term selected by the Board and allowing for credits.

The Governor acknowledged Jackson had made efforts to improve himself while incarcerated, but concluded these were "outweighed by negative factors that demonstrate he remains unsuitable for parole." The Governor specifically stated:

> "Mr. Jackson's crime was callous and abhorrent. Without any
> apparent reason or provocation, he went to Ms. Toliver's room and
> bludgeoned her to death with a hammer. He then stole $1000 from her
> dresser drawer and fled.
> "I am troubled that Mr. Jackson cannot adequately explain his
> reasons for brutally attacking Ms. Tolliver. He told the psychologist who
> recently evaluated him that he was trying to prove his worth and that he

2

'needed someone to see [him] as a dominant figure for validation.' At his hearing, he explained that he wanted to prove to himself that he was powerful and that after years of sexual abuse as a child, 'I needed somebody to carry my pain, somebody to suffer worse than I had been suffering.' He picked Ms. Toliver because she was the weakest person he knew.

"Childhood sexual abuse is undeniably traumatic, but it does not justify nor explain why Mr. Jackson was willing to kill an innocent person in such a brutal fashion and without a moment's thought. There are deeper reasons underlying his desire to seek validation by targeting 'the weakest person he knew.' Until Mr. Jackson is better able to describe what caused him to become so indifferent to human life, I am not prepared to release him at this time."

## DISCUSSION

### A.     *Applicable Legal Framework and Standard of Review*

"The applicable statutes provide that the Board is the administrative agency within the executive branch that generally is authorized to grant parole and set release dates." (*In re Lawrence* (2008) 44 Cal.4th 1181, 1201 (*Lawrence*) [citing Penal Code sections 3040, 5075 et seq.].)[2] Section 3041 provides the Board "shall normally set a parole release date" one year prior to the inmate's minimum eligible parole release date, "unless it determines that … consideration of the public safety requires a more lengthy period of incarceration." (§ 3041, subds. (a)–(b).) "Accordingly, parole applicants in this state have an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation." (*Lawrence, supra,* 44 Cal.4th at p. 1204.)

In carrying out the mandate of the statute, the Board is guided by the criteria it has adopted, set forth in title 15, section 2402 of the California Code of Regulations.[3] The regulation not only permits the Board to consider "all relevant, reliable information"

---

[2] All further all further statutory references are to the Penal Code unless otherwise indicated.

[3] All further references to regulations are to title 15 of the California Code of Regulations. The criteria and guidelines set forth in section 2402 apply to prisoners sentenced to prison for first and second degree murders committed on or after November 8, 1978. (See Regs., § 2400.)

3

bearing on the prisoner's suitability for release, but also lists specific circumstances tending to show both suitability for parole—such as an inmate's rehabilitative efforts and demonstration of remorse—and unsuitability for parole—such as the heinous nature of the commitment offense or a previous record of violence. (See Regs., § 2402, subds. (b), (c) & (d).) Additionally, the regulation states the enumerated factors tending to show suitability or unsuitability "are set forth as general guidelines" and "the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." (*Id.*, subds. (c), (d).) In determining suitability for parole, it is the Board's role to weigh and resolve any conflicts in the evidence, and the Board's parole decisions are accorded "broad discretion." (*Lawrence, supra,* 44 Cal.4th at p. 1204.)

Broad discretion also extends to the Governor's independent review of a Board's parole decision. (*Lawrence, supra*, 44 Cal.4th at p. 1204.) In this regard, the Governor "has discretion to be 'more stringent or cautious' in granting parole, and as long as the Governor's decision " 'reflects *due consideration of the specified factors* as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the Governor's decision.' [Citation.]" (*Ibid.*)

Notwithstanding the broad discretion accorded the Board and the Governor, judicial review of the executive decision to deny parole must reach "the *merits* of a parole decision" and be of sufficient scope to provide "a constitutionally adequate and meaningful review of a parole decision." (*Lawrence, supra,* 44 Cal.4th at pp. 1204–1205.) Judicial review focusing only on procedural safeguards could permit the Board "to render a decision without any 'basis in fact' and not supported by any evidence in the record . . . . Such a decision would be arbitrary and capricious and, because it affects a protected liberty interest, would violate established principles of due process of law." (*Ibid*.)

In outlining the scope of judicial review in parole matters, the Supreme Court observed, "the fundamental consideration in parole decisions is public safety" and "the

4

core determination of 'public safety' under the statute and corresponding regulations involves an assessment of an inmate's *current* dangerousness." (*Lawrence, supra,* 44 Cal.4th at p. 1205.) Accordingly, "when a court reviews a decision of the Board or the Governor, the relevant inquiry is whether some evidence supports the decision of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." (*Id.* at p. 1212.)

"[E]vidence in the record corresponding to both suitability and unsuitability factors—including the facts of the commitment offense, the specific efforts of the inmate toward rehabilitation, and, importantly, the inmate's attitude concerning his or her commission of the crime, as well as the psychological assessments contained in the record—must, by statute, be considered and relied upon by both the Board and the Governor, whose decisions must be supported by some *evidence*, not merely by a hunch or intuition. By reviewing this evidence, a court may determine whether the facts relied upon by the Board or the Governor support the ultimate decision that the inmate remains a threat to public safety." (*Lawrence, supra*, 44 Cal.4th at p. 1213, italics in original.)

In *Lawrence,* the court ultimately concluded the Governor's denial of parole violated the petitioner's due process and statutory rights because the evidence relied upon by the Governor—the egregiousness of the commitment offense—did not constitute " 'some evidence' " the petitioner remained a "current threat to public safety." (*Lawrence, supra*, 44 Cal.4th at p. 1227.)

In *In re Shaputis* (2011) 53 Cal.4th 192 (*Shaputis II*), the court reaffirmed the "deferential character of the 'some evidence' standard for reviewing parole suitability determinations" (*id.* at p. 198), while offering "general guidance to the Courts of Appeal on inmates' lack of insight as a parole unsuitability factor." (*Id.* at p. 200.) Preliminarily, the court noted that "under the 'some evidence' standard, '[o]nly a modicum of evidence is required.' " (*Id.* at p. 210.) Thus, in reviewing a parole unsuitability determination by the Board or the Governors "a court must consider the whole record in the light most favorable to the determination before it, to determine whether it discloses some

5

evidence—a modicum of evidence—supporting the determination that the inmate would pose a danger to the public if released on parole. [Citations.]" (*Id.* at p. 214.)

The court also noted that in the wake of its decisions in *Lawrence* and *Shaputis I*—which "reorientated the focus of parole suitability review, making it clear that the inmate's *current* dangerousness is the crucial determination"—parole authorities were giving greater attention to lack of insight as a basis for this determination. (*Shaputis II, supra,* 53 Cal.4th at p. 217.) While "[c]onsideration of an inmate's degree of insight is well within the scope of the parole regulations" which direct the Board to consider such factors as past and present attitude towards the crime, the presence of remorse and whether the inmate understands the nature and magnitude of the offense, "lack of insight, like any other parole unsuitability factor, supports a denial of parole only if it is rationally indicative of the inmate's current dangerousness." (*Id.* at pp. 218–219.)

Unlike the immutable circumstances of the commitment offense, which are rooted in the past, insight "pertains to the inmate's current state of mind" and also may change over time. (*Shaputis II, supra*, 53 Cal.4th at pp. 218–219.) "Thus, insight bears more immediately on the ultimate question of the present risk to public safety posed by the inmate's release." (*Ibid.* ) Furthermore, because insight can change over time, "the most recent evidence of the inmate's degree of insight will usually bear most closely on the parole determination." (*Shaputis II, supra,* 53 Cal.4th at pp. 219–220.) The "insight factor" also calls for a "particularly individualized consideration." (*Id.* at p. 219, fn. 12.) Accordingly, "'expressions of insight and remorse will vary from prisoner to prisoner and ... there is no special formula for a prisoner to articulate in order to communicate that he or she has gained insight into, and formed a commitment to ending, a previous pattern of violent behavior.' (*In re Shaputis* [(2008)] 44 Cal.4th [1241,] 1260, fn. 18 . . . .)" (*Ibid.*)

## B.     *The Record on Insight*

As we set forth above, the Governor's reversal of the Board's decision granting Jackson parole is based on lack of insight. Specifically, while recognizing that "[c]hildhood sexual abuse is undeniably traumatic," the Governor stated: "[I]t does not

justify nor explain why Mr. Jackson was willing to kill an innocent person in such a brutal fashion and without a moment's thought. There are deeper reasons underlying his desire to seek validation by targeting 'the weakest person he knew.' Until Mr. Jackson is better able to describe what caused him to become so indifferent to human life, I am not prepared to release him at this time."

We have reviewed the entire record before the Board to determine whether a "modicum" of evidence supports the Governor's implicit determination Jackson's lack of insight "is rationally indicative of the inmate's current dangerousness" and supports denial of parole. (*Shaputis II, supra,* 53 Cal.4th at p. 219.) Our review of the record discloses the following:

**Insight in 1998**

*Psychological Report*

In a psychological evaluation report apparently prepared in very early 1998 (copy sent to petitioner on January 26, 1998), it was noted Jackson's "[r]ecall was excellent for major life events, with, of course, the exception of the commitment offense." It was also the psychologist's assessment, however, that it "seem[ed] reasonable to accept the inmate's own perception that acute intoxication contributed to his commitment offense. Apart from that, no mental condition can be assumed responsible. He had previously arrived at the age of 25 without coming to the attention of the police, which further suggests that he may not have had a strong proclivity to violence. Further indications of this can be found in his prison adjustment, in which I found no indications that he has picked up charges involving physical acting out." Noting there would need to be careful monitoring for substance abuse if paroled, the psychologist viewed petitioner "as being at low risk to reoffend."

*Life Prisoner Evaluation Report*

The Life Prisoner Evaluation Report prepared in March 1998 for Jackson's initial parole consideration hearing essentially repeats what was stated in the June 1988

7

probation report prepared for sentencing. It reports Jackson as saying he was young and impressionable and was teased by his cohorts about his working and having no fun. He started drinking and abusing drugs. One afternoon they started talking about needing money, the victim had some, and they should take it. One thing led to another, and he ended up committing the crime. He could not believe he had done it, went back home and to work, and thought everything would be all right and his cohorts would leave him alone. He allowed himself to be influenced, and was truly sorry.

Considering the callousness of the offense, Jackson's prison record (which at that point was not stellar), and his interaction with Jackson, the counselor concluded he would pose an unpredictable threat to the public if released. He urged Jackson to develop and maintain a discipline-free record, and to participate in self-help or therapy.

The Parole Board gave Jackson a three-year denial "with the following recommendations: Become and Remain disciplinary free, Upgrade Vocationally, Educationally and to Participate in Self-Help and Therapy."[4]

### Insight in 2001

#### Psychological Report

In a psychological evaluation report prepared in October 2001, Dr. Melvin Macomber reported Jackson stated he had suffered significant physical abuse by his father as a child and for a period had set fires to get his mother's attention until he burned his arm. He also ran away several times and lied to get his mother's "undivided attention." He suffered emotional abuse by his stepfather, and was "sexually involved with cousins as a child." "This started in with experimentation and fondling and was stopped at the age of 11 when the children's activities were discovered." He became involved with methamphetamine and cocaine just before committing the crime. He was

---

[4] The Board is required for due process reasons to state the reasons for a denial of parole so the inmate can address those specific concerns and move toward parole. (*Shaputis II, supra,* 53 Cal.4th at pp. 223–224 (conc. opn. of Liu, J.).)

on his own and working, and met some homeless people, who he invited to live with him because he felt sorry for them. They were users and introduced him to drugs, which he described as "a very fatal decision that was related to his commitment offense." At the time of the offense, "he was thoroughly intoxicated on alcohol, methamphetamine, and cocaine." He was not participating in NA or AA, stating he had attended classes but had been vocal about inmates who blamed drugs and did not take responsibility for their conduct. In discussing his improved prison conduct, he stated he had gone through a period of being angry, but then became involved in Muslim studies and began "to search out his own life, his own motivations, and his family history as to how it contributed toward his defensiveness." "As a result of this insight, he now is able to handle stressful events and verbal confrontation in a patient, polite, and understanding way." Dr. Macomber stated: "It is evident that Mr. Jackson has made great gains in this area, and his statements do indicate a high level of maturity, as well as self-control. It is evident that he has come a long way in his self-esteem, understanding of his problems, and his ego-strength."

In discussing the life crime, Macomber reported it was "clear that [Mr. Jackson's] memory of this offense is severely impaired," noting he "was extremely intoxicated at the time." However, Jackson "made it very clear" he was not blaming "any external conditions," but accepted full responsibility for the crime. Jackson described his conduct "as an 'act of stupidity.' " It was "very evident that Mr. Jackson's level of remorse, guilt, and sorrow about this offense is very great."

Macomber concluded: "Mr. Jackson has obviously spent a great deal of time soul searching. He has developed a strong ethical framework, probably in part due to his religious studies. He has learned to be nondefensive in his relationships with others. It is evident that he is now more able to respond to stress with maturity, self-awareness, and sound judgment. His insight is very good. It is evident that his remorse and sorrow are intense. This commitment offense was entirely out of character. This man has no

9

criminal record, and it is evident that there is no sign of criminal thinking or values in his speech. The commitment offense appears to be a very out-of-character, one-time event that is associated with his extremely intoxicated condition at the time of the offense on drugs and alcohol. It is evident that, if he had been sober, this offense would not have occurred."

As to Jackson's current dangerousness, Macomber stated: "I believe his potential for violence is extremely small. If released to the community, assessment of dangerousness would again be extremely small. This man has developed very strong ethical boundaries, he has made great gains in his ability to relate to others in a mature and responsible way and he has good judgment and self-awareness. I do not believe that in this case there is any risk that he would revert to drug or alcohol abuse." [5] Given Jackson's religious orientation, Macomber did not believe petitioner was in need of self-help groups NA or AA.

*Life Prisoner Evaluation Report*

In the Life Prisoner Evaluation Report prepared for his 2001 hearing, Jackson stated "his version of the crime ha[d] not changed and remain[ed] the same as stated in his 1998 Initial Parole Consideration Hearing Report." The counselor concluded "[c]onsidering the Commitment offense, and prisoner's adjustment, this writer believes the prisoner would pose an High degree of threat to the public at this time, if released from prison." He also stated Jackson "could benefit from remaining disciplinary free, upgrade vocationally and participating in self-help or therapy program [*sic*]."

The Board denied parole for two years, recommending Jackson remain disciplinary free, upgrade vocationally, and participate in self-help.

---

[5] Jackson's insight in 2001 and 2003 is also discussed in the 2004 psychological examination report prepared by Dr. Richard Starrett in anticipation of petitioner's 2005 parole hearing.

*Insight in 2003*

*Life Prisoner Evaluation Report*

In the Life Prisoner Evaluation Report prepared in July 2003, Jackson described the events of the commitment offense as follows:  He was young and impressionable and had moved out of his parents home and was living in a hotel where he worked.  He started hanging out with the wrong crowd, and was teased about going to work and not having any fun.  He saw them partying and wanted to be part of it, so he started partying, drinking and using drugs.  One afternoon, they started talking about how they needed more money, believed the victim had some and concluded they "should just take it." So he, alone, went down the hall and committed the crime.  Afterwards, he "could not believe" what he had done, returned home and thought things would be all right.  He knew what he had done was wrong and he was truly sorry.  He blamed no one but himself, and had allowed himself to be influenced by other, choosing to get drunk and high, and to rob and kill the victim.

The counselor concluded "[c]onsidering the commitment offense, prior record, and prison adjustment, this writer believes this prisoner would pose a High degree of threat to the public if released from prison at this time.  This assessment is based on Jackson's numerous rules violations reports from previous reporting periods.  Furthermore, there is no evidence that Jackson has participated in any self-help or therapy programs.  To Jackson's credit, he has always been polite and respectful when dealing with this writer."

**Insight in 2004–2005**

*Psychological Report*

In the October 19, 2004, psychological evaluation report prepared in anticipation of Jackson's 2005 parole hearing, Dr. Richard Starrett reported Jackson as stating he "has always had memory problems" with respect to the crime and thought this was because he did not want to accept the fact he had committed the crime.  He was, in the past, "terrified

11

to talk about the crime, that it just didn't seem like him, and now he realizes it was an accident." He also told Starrett he was high on multiple substances and drunk. One of his cohorts claimed the victim owed him money for drugs, and while he (Jackson) was passing in and out of consciousness, another cohort woke him up, said the other one had taken Jackson's hammer and was headed down the hall to the victim's apartment. Jackson arrived as the victim opened the door. He saw the other cohort make a downward motion, and was "so mad" he took the hammer and tried to hit him, but hit the victim, instead. His cohorts said she would be alright, and they took money from the apartment and headed to San Diego. He was then abandoned by these individuals, called home, told his mother what had happened and returned home. He told Starrett he realized this was a new account of his actions, and had taken responsibility for it, sending a letter to the Parole Board approximately two years previously. Starrett was unable to locate this letter.

Starrett summarized that while Jackson has always taken responsibility for the crime, his accounts of it (as we have summarized) have varied. Starrett was of the opinion Jackson's understanding of his actions was one of several matters he needed to address, noting he (Starrett) would "like to see a record of treatment in NA and AA, and would like to see self help, anger management, and exploration between his abuse in childhood and the role that may have played in the current offense." The abuse referenced in the report is physical and emotional abuse by his father, and emotional abuse by his stepfather. The report also references Jackson's first sexual encounter "with cousins when he was about seven," but makes no mention of sexual abuse.

12

*Parole Hearing*[6]

Jackson gave essentially the same account of the crime to the panel at his November 4, 2005, parole hearing that he provided to Starrett. He stated he was basically in denial until two years previously, and at that time finally focused on the events and was now stating what had actually happened, i.e., that the killing was an accident. The Commissioners grilled petitioner about this new "accident" version of events, stating it made little sense he would have initially claimed to have acted alone and admitted to bludgeoning the victim, and then later claim he was trying to protect the victim and struck her accidentally.

The panel denied parole for two reasons: the gravity of the offense and Jackson's minimal participation in self-help. Among other things, the panel wanted Jackson to "continue participating in self-help programs to assist [him] in developing further insight not only to the commitment offense but some of the issues that you may have experienced up to that point as a result of the physical abuse within the home." The panel found Jackson had *not* been "totally forthright" about his role in the commitment offense and questioned his new account that the killing was an accident. Until progress was made in this regard, the panel agreed with Starrett that Jackson continued to be "unpredictable and a threat to others." The panel's recommendation was "to get self-help, stay disciplinary free, learn a trade, get therapy, and earn positive chorons [*sic*]."

### Insight in 2008

*Psychological Report*

In the May 22, 2008, psychological evaluation report prepared in anticipation of Jackson's September 2008 parole hearing, Dr. Richard Kendall reported Jackson as stating the crime "was a product of his usage of alcohol, cocaine, and methamphetamine

---

[6] While there is a progress report in the record correlating to the 2005 hearing, we are unable to find a Life Prisoner Evaluation Report prepared for that hearing.

13

and having been awake for approximately three days." Jackson said he first started using drugs and alcohol about three weeks before the crime. He did not think he had a substance abuse problem for which he needed support through NA and AA programs. He acknowledged a CDCR 115 for marijuana possession, but claimed he was given a cigarette by another inmate and did not realize it was marijuana until he lit it, and was caught before he could get rid of it. As to the life crime, Jackson described it as the result of drugs and alcohol and the desire for money. He stated the situation started out as "a joke," with banter between himself and a cohort, and "the next thing you knew" they were headed to the victim's apartment. Kendall reported Jackson said, "[s]he owed me money." Jackson also said he became the designated "tough guy" and hit her over the head, and they then "ransacked" the victim's apartment. He accepted full responsibility for the killing.

Kendall concluded Jackson "demonstrated a good amount of insight into his behaviors" that led to the crime and also "past behaviors which lead him to engage in violence." He believed Jackson had continued "to comply with the recommendations that the BPH panel has set for him." As to insight, Kendall concluded: Jackson "displayed a working knowledge of some of the factors that contributed to his behavior," but "appeared to over emphasize his drug usage and downplay his intent on the day of the crime. [He] can benefit from further examination of the internal factors that lead to his violent behavior. Factors such as his willingness to violate the rights of others in achieving his goals and his willingness to use violence should continue to be explored."

*Parole Hearing*[7]

At the parole hearing on September 23, 2008, when asked why he participated in the crime, Jackson answered, "[s]tupidity," "immaturity," and trying to fit in with a

_____

[7] While there is a progress report in the record correlating to the 2008 hearing, we are unable to find a Life Prisoner Evaluation Report prepared for that hearing.

14

group. He said he did not need money, and had "allowed" himself to be a participant. He met his cohorts as he went to and from his job, believed they were homeless and offered them a place to stay. They were users, living a "new" and seemingly "fun" lifestyle in his then immature view. Things went "downhill from day one." As for the crime, he "wanted to be part of something." He repeated the group had bantered about robbing the victim. Jackson started teasing one of the others, saying that individual was a "coward" and would never follow through with the robbery. He stated the victim did not owe him money, but another of his cohorts claimed she owed him money. Nevertheless, Jackson admitted he was "gung ho" for the robbery, which he now characterized as a "disillusion thing . . . [that] we really gonna do something big." He said the three knocked on the victim's door, one cohort asserted she owed him money, they pushed their way in, and Jackson hit her. He said one of the other's had handed him the hammer on the way to the victim's apartment. The panel questioned Jackson closely about when and how he hit the victim. Jackson denied he intended to kill her to prevent her from identifying the group. In fact, he denied he intended to kill her at all and said the plan was to "knock her out" and take the money. Jackson expressed profound remorse, describing her as a friend. He called his behavior "[s]ick." "I ask myself all the time how—how can you explain this to yourself." He said it was a situation "that I myself don't understand." When asked whether he had really looked into why he had acted so violently and obtained insight, Jackson answered he believed it "had a lot" to do with his family situation and he "had a lot of abandonment issues." He was angry at not getting the parental attention he wanted and felt he deserved. He could not, however, "even explain it to [himself]" why he would have gone "this far" to get attention.

The panel denied parole for one year, focusing again on the seriousness of the crime and also on Kendall's opinion Jackson could benefit from further examination of his conduct, stating he was "moving that direction" on that score. Two members of the

15

panel specifically commented Jackson provided answers on insight that were "very blunt and frank and candid."

### Insight in 2009

*Life Prisoner Evaluation Report*[8]

This is a fairly cursory report that notes Jackson's version of the offense "[r]emains the same as stated in previous hearings." In fact, most items state simply things "remain the same." No opinion is expressed as to Jackson's risk to the community if released. In the summary, the counselor states "[p]rior to release, the prisoner could benefit from: [¶] 1. Continued disciplinary free behavior. [¶] 2. Upgrading academically/vocationally. [¶] 3. Participation in self/help therapy."

*Parole Hearing*

At the parole hearing, on August 24, 2009, Jackson gave much the same account of the crime as he had at the prior hearing—that he had allowed his cohorts to start living with him, one of them claimed the victim owed him money, they "joked" around about robbing her, and petitioner teased his cohort that he (the cohort) was too much of a coward to go through with a robbery, and he (Jackson) took on the lead to show he was a "tough guy." Jackson had been using drugs and alcohol for about a month to try to fit into what he then perceived was a "fun" life. He took the hammer with him, and again answered "[s]tupidity" when asked why he hit the victim. He acknowledged there was "no need" for the hammer. He believed he hit her from behind and acknowledged hitting her three times. He denied ever having said he did not take the hammer with him or having said the blows were "accidental." Rather, the group was going to "knock her out" and take the money. He did not, however, intend to kill her. He panicked and said he needed to go "home" and get ready for work. They rifled through the apartment looking

---

[8] The record contains no additional psychological report prepared in connection with this hearing.

16

for money, found about a $1,000.  They all shared it and went to San Diego, where he quickly ran out of money and called his mother for help returning home.

When asked why he had not taken any steps for self-improvement before the 2002–2003 time frame, Jackson acknowledged an inability to deal well with confrontation and that he reacted defensively.  He believed it took him a long time to mature, saying it was a "real struggle."  He also acknowledged the seriousness of his drug and alcohol use.  When asked about insight into the violence of the crime, Jackson stated there was a "lot" he now understood and that "it had a lot to do with my childhood and being disconnected."  He had learned to express no emotion and "over a period of time [became] very disconnected emotionally."  He continued to be very remorseful:  "[I]t's sickening . . . something [I] will have to deal with for the rest of my life."

The Board denied parole for three years ("the lowest level of denial" it could give at that time), focusing again on the seriousness of the crime and lack of insight.  As to the latter, the panel was concerned Jackson still could not explain why he had taken the hammer or bludgeoned the victim.  The panel was also concerned he did not have in place sufficient supports to prevent drug and alcohol use.  The Board "recommended he stay disciplinary free, earn positive chromos, get self help and improve parole plans."

### *Insight in 2012*

#### *Psychological Report*

In the April 16, 2012, psychological evaluation report prepared in anticipation of Jackson's July 2012 parole hearing, Dr. C. Clarizo reported that in addition to suffering physical and emotional abuse throughout his childhood, Jackson had also been a victim of sexual abuse.  Clarizo indicated this abuse was "noted in the records" and Jackson confirmed "an extensive history of sexual abuse by his cousins."  When Clarizo questioned Jackson about it, he "became emotional and required a few minutes to regroup."  He said this occurred between the ages of three and 12, and he finally told his

17

mother and stepfather when he was 12. His cousins blamed him, and afterwards his parents became even more abusive.

Clarizo provided an extended discussion of Jackson's insight and concluded he was able to "discuss the specific internal or decision-making changes he has made to date, such as working through his resentment and his abuse and letting go of the past." Jackson "appeared to have a clear awareness of the underlying factors shaping past anti-social decisions and behaviors." Clarizo also concluded Jackson had "gained adequate insight and awareness regarding the role that alcohol/illicit substances . . . has played in the circumstances of his life," and had "developed sufficient coping strategies to manage . . . triggers upon his release to a less restricted environment." Jackson's discussion of the events of the life crime were essentially the same as he had recited to Dr. Kendall and the two prior parole board panels—the incident started with him heckling a cohort who claimed the victim owed him money, he took the hammer with him, and hit the victim three times. He was trying to "prove that I was important to someone . . . anyone." He continued to express profound remorse.

Clarizo concluded Jackson was "able to adequately voice what it means to have 'insight' "—"to look back at the situation and relate any insights he had as to what contributed to his behavior." Jackson reiterated he was seeking " 'validation, from someone, anyone. I have learned that my abuse made me want to not be a victim anymore . . . but in the process I turned into the victimizer.' " Clarizio further concluded Jackson "was able to see the dynamics within himself that were not limited to the life crime which contributed to his impulsive choices that day, what prompted his substance abuse and the internal factors which maintained it." As for risk potential, Clarizio was of the opinion Jackson "presented with non-significant risk factors and specialized intervention and risk reduction strategies appear unwarranted; rendering a *low or non-elevated risk of violence* if released," assuming no use of alcohol or drugs. (Italics in original.)

18

*Life Prisoner Evaluation Report*

In this report, Jackson's version of the crime is recounted in language identical to that in the July 2003 evaluation report. No opinion is expressed as to his risk to the community if released. In the summary, the counselor states "[p]rior to release, Jackson could benefit from the following: [¶] 1. Remain disciplinary free. [¶] 2. Earn positive chronos. [¶] 3. Participate in additional self-help and therapy programs whenever available. [¶] 4. Improve parole plans."

*Parole Hearing*

At the July 27, 2012, parole board hearing, the panel asked Jackson about the reported sexual abuse, and he elaborated that he had first gone to his aunt and uncle, his cousins said it was his fault, his mother had then entered the room, was angry and said she wished he was "dead" and he was "sick." He resolved at that point that he "would no longer express any emotion to anybody." Anytime he tried, he cried, which made his parents (mother and stepfather) angrier, so he told himself "it was useless to express emotions." When he was 14 he went to live with his father, who was physically abusive. Jackson later learned his father had also been the victim of serious abuse. In response to questioning about why he appeared to have turned a corner in 2001 in terms of starting to help himself, he responded his mother had breast cancer and it "finally hit" him how vulnerable she was, but she had continued to support him and said she was not angry with him. He realized he "had to grow up" and start taking responsibility for his actions and life.

Jackson largely reiterated what he had told Clarizio about the crime. He told the panel the victim had not owed anyone money, that that was a "story" he had made up and had clung to "until about 2005." He denied that he told Clarizio or the prior panel the victim had actually owed money, and only said that was the story he had told. The panel confirmed that at the 2008 hearing, Jackson had said the victim had not owed him any money, but noted confusion as to this point in the psychological reports. When asked the

19

motive for the crime, Jackson said, "I understand now I needed somebody to carry my pain, somebody to suffer worse than I had been suffering . . . . And I needed an easy target because I was too much of a coward to deal with it." Asked about the hammer, Jackson said he did not then see himself as the large physical presence he is, and he "needed to prove for once that [he] was actually somebody." It "was my power," the "first time that I would ever have any power that no one could defend against." "[W]hen I grabbed that hammer, that gave me a sense of strength, a sense of power." "Somebody else needs to hurt, and unfortunately I chose who I thought was the weakest person I knew, and that was Shirley." He commented the 2005 parole hearing made him realize he had not really taken responsibility for crime and his actions, and had been blaming the alcohol and drugs, and everyone else for his actions. He identified blaming others and lashing out as his "worst character defect," and said he focuses every day on keeping himself in check and not being a "loathing, blaming, resentful, dark person who doesn't take responsibility for his life." In his final statement to the panel, Jackson acknowledged the "inconsistencies" in his version of the crime, stating these reflected his effort "to escape this entire situation," which he did for a "lot of years." At the time, he "couldn't believe that this was me. But the reality is it is me, and it was me as the end result of going through certain things that I did not like talking about."

The panel found Jackson suitable for parole. It found the crime "heinous and atrocious," but noted after 25 years, that tended to carry less weight. And while it found Jackson suitable for parole, it did so after "fully considering the other circumstances that one might argue tend to show unsuitability for parole." These included Jackson's "unstable social history," the "abusing drugs and alcohol," and "misconduct while incarcerated" (although disciplinary free for 11 years). Additional factors "that tend to show unsuitability," but which the panel concluded it would discount given the positive factors it perceived, were "past inconsistencies about [the] crime," "a past history of minimization and blaming others," and "credibility concerns."

20

The panel commented some individuals never gain insight, and Jackson's "did take time, but over the years you have managed to obtain it." The panel also observed both Dr. Clarizio in 2012 and Dr. Kendall in 2008 concluded Jackson presented a low risk of future violence. Commissioner Martel specifically commended Jackson for "complying with the recommendations of the Board."

## C. *The Record Evidence of Current Dangerousness*

There is no question the life crime was egregious. Jackson brutally bludgeoned a middle-aged woman to death to facilitate a robbery, conceived shortly before the crime while he and his ill-chosen friends were "joking around," to finance their continued drug and alcohol abuse. Jackson not only knew the woman, who lived in his apartment complex, she had befriended him.

However, the egregiousness of an offense can be relied on to deny parole only if it is predictive of current dangerousness. "[T]he relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense." (*Lawrence, supra,* 44 Cal.4th at p. 1221.) In that regard, an inmate's level of insight can properly be considered in determining parole suitability. (*In re Shaputis, supra*, 44 Cal.4th 1241, 1258–1261 (*Shaputis I*).)

As we have set forth above, the Governor's decision not to release Jackson "at this time"—and thus the Governor's implicit finding of current dangerousness—is predicated solely on lack of insight. The record, however, irrefutably establishes that Jackson has significant insight into why he committed the life crime and has exhibited remorse. Indeed, the record on insight here is every bit as extensive as in other cases reversing parole denials based on "lack of insight." (E.g., *In re Denham* (2012) 211 Cal.App.4th 702, 715–716; *In re Hunter* (2012) 205 Cal.App.4th 1529, 1539–1542 ; *In re Pugh* (2012) 205 Cal.App.4th 260, 269–271; *In re Morganti* (2012) 204 Cal.App.4th 904, 924–925; *In re Ryner* (2011) 196 Cal.App.4th 533, 548–550 (*Ryner*); *In re Nguyen* (2011)

195 Cal.App.4th 1020, 1034–1036 (*Nguyen*); *In re Palermo* (2009) 171 Cal.App.4th 1096, 1110–1112, overruled on another ground by *In re Prather* (2010) 50 Cal.4th 238, 252.)

Nevertheless, the Governor posited an insufficiency in Jackson's insight—that beyond the damage caused by the emotional, physical and sexual abuse Jackson suffered throughout his childhood, there "are deeper reasons underlying his desire to seek validation by targeting 'the weakest person he knew.' " There is not a scintilla of evidence, however, supporting the Governor's assertion there are "deeper reasons" for Jackson's brutal and murderous attack. The psychological evaluations did not hint at any such "deeper reasons." Nor did any evidence of such reasons surface during the hearings before the Parole Board.

This case is, thus, akin to *Nguyen,* in which the appellate court concluded "[t]he fault the Governor found with the 2008 mental health evaluator in failing 'to explore the more important issue of why [the inmate] reacted to these feelings of rejection with such obsessive behavior and extreme violence' does not supply the missing evidence of dangerousness." (*Nguyen, supra*, 195 Cal.App.4th at p. 1036.) The psychological evaluation of Nguyen prepared in anticipation of his 2008 parole hearing had concluded he " 'demonstrated a *well developed awareness* of the causes that resulted in the death of a human being.' " (*Id.* at p. 1035, italics in original.) After the Board denied parole with a one-year review, the inmate continued to work on his insight, and the following year the Board granted parole. The Governor reversed, identifying lack of insight. (*Id.* at pp. 1034–1035.) The Court of Appeal reversed, holding the *absence* of evidence resulting from the Governor's "perceived shortcoming" in the evaluator's examination could not, and did not, constitute evidence of dangerousness. (*Id.* at p. 1036.)

In short, a parole decision by the Governor, as one by the Board, must be grounded on at least some evidence. It cannot be based on supposition and speculation. (See *Ryner, supra,* 196 Cal.App.4th at p. 548 ["it is settled that the Board may not base

22

its findings on hunches, speculation, or intuition"].)  But that is all that can be said about the Governor's assertion here that there are "deeper reasons" why Jackson committed the life crime which he has not yet discerned and addressed.[9]

Not only is there no evidence of a "deeper reason" for Jackson's criminal conduct which he has not yet discerned, there is, likewise, no evidence such a shortcoming in his insight is any indication of current dangerousness.  (See *In re Morganti, supra,* 204 Cal.App.4th at pp. 923, 925 [there must be some "*connection* between any lack of insight on [the inmate's] part and the conclusion that he is currently dangerous"].)

The discussion of insight in *Ryner* is apposite on this point.  As in the instant case, there was no question in *Ryner* the inmate had considerable insight into why he committed the life crime.  This led the appellate court to observe:

> "Perhaps the Governor was concerned that Ryner lacks sufficient insight into the life crime.  Of course, personal insight has long been recognized as a worthy goal.  However, we have to question whether anyone can ever fully comprehend the myriad circumstances, feelings, and current and historical forces that motivate conduct, let alone past misconduct.  Additionally, we question whether anyone can ever adequately articulate the complexity and consequences of past misconduct and atone for it to the satisfaction of everyone.  Indeed, the California Supreme Court has recognized that 'expressions of insight and remorse will vary from prisoner to prisoner and . . . there is no special formula for a

---

[9] Notably, the Governor did not identify as a reason for denying parole changes in Jackson's version of the events of the life crime.  Through 2005, Jackson minimized his role in the crime, saying he was young and naïve, had fallen in with a bad crowd, followed their lead, had not himself taken up the murder weapon and, in fact, had tried to take the hammer away from one of his co-perpetrators and accidentally struck the victim.  The 2005 Parole Board panel told Jackson it was impossible to believe this self-delusional version of events, and he needed to acknowledge and come to grips with his role in the crime.  Jackson did so, and three years later, at his next parole hearing, acknowledged and discussed his utter complicity in the crime.  Since then he has never minimized his role in the crime or attempted to shift responsibility for the killing away from himself.  Thus, to the extent Jackson's "attitude regarding his involvement in the crime has varied, the record shows that his attitude has evolved in a positive manner that supports parole." (*In re Pugh, supra,* 205 Cal.App.4th at pp. 266, 268 ["any difference in [inmate's] version of the crime provides no evidence of current dangerousness"].)

prisoner to articulate in order to communicate that he or she has gained insight into, and formed a commitment to ending, a previous pattern of violent behavior.' (*Shaputis, supra*, 44 Cal.4th at p. 1260, fn. 18.) More importantly, in our view, one always remains vulnerable to a charge that he or she lacks sufficient insight into some aspect of past misconduct even after meaningful self-reflection and expressions of remorse. Moreover, we consider the very concept of 'insight' to be inherently vague and find that whether a person has or lacks insight is often in the eye of the beholder. Hence, although a 'lack of insight' may describe some failure to acknowledge and accept an undeniable fact about one's conduct, it can also be shorthand for subjective perceptions based on intuition or undefined criteria that are impossible to refute. (See, e.g., *In re Dannenberg* [(2009)] 173 Cal.App.4th 237, 255–256.)." (*Ryner, supra,* 196 Cal.App.4th at p. 548.)

Accordingly, "[e]vidence of lack of insight is indicative of a current dangerousness only if it shows a *material* deficiency in an inmate's understanding and acceptance of responsibility for the crime. To put it another way, the finding that an inmate lacks insight must be based on a factually identifiable deficiency in perception and understanding, a deficiency that involves an aspect of the criminal conduct or its causes that are significant, and the deficiency by itself or together with the commitment offense has some rational tendency to show that the inmate currently poses an unreasonable risk of danger." (*Ryner, supra*, 196 Cal.App.4th at pp. 548–549, fn. omitted.)

Thus, "[a]ccepting as we must, that an inmate's insufficient understanding of the causes of his crime is a factor that may show him unsuitable for parole, it is not enough to establish that the inmate's insight is deficient in some specific way." (*Morganti, supra*, 204 Ca.App.4th at p. 923.) There must be, in addition, some connection between the cited deficiency and the conclusion of current dangerousness. (*Ibid.*) There is no evidence in the instant record, however, of any connection between the supposed deficiency in Jackson's insight and current dangerousness.

In sum, there is a lack of evidence on both factors pertinent to lack of insight. First, there is no evidence of a "deeper reason" underlying Jackson's murderous action and thus no "factually identifiable" deficiency in his insight. Second, even if there were

24

such a deficiency in Jackson's insight, there is no evidence such deficiency, by itself or together with the commitment offense, has some rational tendency to show current dangerousness.

The conclusion in *Ryner* is, thus, equally apposite here: "Where, as here, undisputed evidence shows that the inmate has acknowledged the material aspects of his or her conduct and offense, shown an understanding of its causes, and demonstrated remorse, the Governor's mere refusal to accept such evidence is not itself a rational or sufficient basis upon which to conclude that the inmate lacks insight, let alone that he or she remains currently dangerous." (*Ryner, supra*, 196 Cal.App.4th at p. 549.)

The circumstances in *Shaputis*, in which the Supreme Court held the inmate's lack of insight supported the denial of parole, stand in marked contrast. In that case, despite years of therapy and programming, the inmate persisted in recounting a version of events that was factually unsupported or otherwise incredible. (*Shaputis I, supra,* 44 Cal.4th at p. 1260.) For example, his claim that he killed his wife by accident was contradicted by the facts the hammer of the gun had to be manually cocked before the trigger could be pulled and a transfer bar required a person to pull and hold back the trigger in order to fire the gun. (*Shaputis II, supra,* 53 Cal.4th at p. 201; *Shaputis I, supra,* 44 Cal.4th at pp. 1248, 1260.) There was also evidence showing he delayed in calling for emergency assistance for his wife and the murder was the culmination of years of violent and brutalizing behavior toward the victim, his children, and even his prior wife. (*Shaputis II, supra,* 53 Cal.4th at p. 201; *Shaputis I, supra,* 44 Cal.4th at pp. 1247–1248, 1259.) In other words, there were specific facts supporting the conclusion Shaputis was not honest and forthright in claiming what had happened had been accidental, and his distortions all tended to minimize his culpability.[10] (*Shaputis I, supra,* 44 Cal.4th at p. 1260 & fn. 18;

_____

[10] In *Shaputis II*, the Supreme Court held the Parole Board could rely on this evidence even though it was from prior parole hearings. (*Shaputis II, supra,* 53 Cal.4th at pp. 211–212.) As the court explained, *Shaputis II* "is an example of the Board's proper reliance on older evidence in the record, and of the disadvantages that may follow from an inmate's decision not to testify at a parole hearing or otherwise cooperate in the

25

*In re Denham, supra,* 211 Cal.App.4th at p. 715; see also *In re Hunter, supra,* 205 Cal.App.4th at p. 1540 [contrasting cases like *Shaputis* where inmate's account of the life crime " 'was 'physically impossible or strained credulity' "]; *In re Pugh, supra,* 205 Cal.App.4th at pp. 273–274 [inmate's version of events that is "contrary to the facts established at trial and is inherently improbable" indicates a "refusal to admit the truth to himself and to others," and "establishes a nexus to current dangerousness because it indicates the inmate is hiding the truth and has not been rehabilitated sufficiently to be safe in society"]; *Ryner, supra,* 196 Cal. App.4th at p. 547 [Shaputis's lack of insight "was rationally indicative of current dangerousness because it showed that he had not accepted full responsibility for his crime"].)

"As distinct from the circumstances in *Shaputis,*" the record here "demonstrates neither the type nor insufficiency of insight/failure to accept responsibility that would support an inference that [Jackson] will present a danger to the public if released on parole." (*Ryner, supra,* 196 Cal.App.4th at p. 550; see also *In re Riley, supra,* 226 Cal.App.4th at p. 559 [*Shaputis* "quite different" from case where inmate had no prior history of violence and life crime was one-time occurrence, was a high school drop-out and at time of life crime was 20 years old, a social misfit with extremely low self-esteem and had been pressured to commit the crime to "fit in," had not used drugs or alcohol for over 30 years, earned a college degree, and consistently received positive work reports]; *In re Palermo, supra,* 171 Cal.App.4th at p. 1112 [where inmate had no prior criminal history, killing "was not so calculated and evil as to indicate, without more, that he remains a continuing danger to the public 21 years later," and inmate expressed remorse and accepted full responsibility, no evidence supported finding of current dangerousness].)

---

development of current information regarding his or her mental state." (*Id.* at p. 220.) Jackson, in contrast, fully cooperated and testified at all his parole hearings.

We therefore grant Jackson's habeas corpus petition and order the Board's 2012 parole decision reinstated.[11] (See *In re Pugh, supra,* 205 Cal.App.4th at pp. 275–276; *Ryner*, *supra,* 196 Cal.App.4th at pp. 552–553.)

## DISPOSITION

The superior court's denial of Jackson's petition for writ of habeas corpus is reversed. The Governor's decision reversing the Board's July 2012 decision granting Jackson parole is vacated and the Board's parole release order is reinstated.

---

[11] We also deny Jackson's motion to strike portions of the full record before the Board which was supplied at our request by the AG.

_____

Banke, J.

We concur:


_____

Dondero, Acting P. J.


_____

Becton, J.<sup>*</sup>

---