Filed 5/26/15  In re Durant CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| In re DAVID DURANT<br><br>on<br><br>Habeas Corpus. | D066703<br><br><br>(Super. Ct. No. HCN1301) |

APPEAL from an order of the Superior Court of San Diego County, Harry M. Elias, Judge.  Reversed.

Kamala D. Harris, Attorney General, Jennifer A. Neill, Assistant Attorney General, Phillip J. Lindsay and Gregory J. Marcot, Deputy Attorneys General, for Appellant.

Michael Satris, under appointment by the Court of Appeal, for Respondent.

INTRODUCTION

In 1983, Durant pled guilty to second degree murder of his girlfriend's three-year-old daughter, Stephanie, after he brutally beat her with a closed fist for wetting the bed. (Pen. Code, § 187.)[1]  The court sentenced him to an indeterminate term of 15 years to life in prison.  He first became eligible for parole in November 1991.

In 2012, at his ninth parole consideration hearing, the Board of Parole Hearings (Board) found Durant suitable for parole.  However, the Governor exercised his constitutional and statutory authority to review the Board's parole grant and reversed the Board's decision.  Durant filed a petition for writ of habeas corpus with the trial court challenging the Governor's decision.  The trial court issued an order granting habeas relief, finding the Governor's reversal was arbitrary and was not supported by some evidence.

The acting warden of the prison where Durant is incarcerated appeals the order contending some evidence supports the Governor's decision that Durant is unsuitable for parole.  We agree and, consequently, reverse the trial court's order granting habeas relief.

BACKGROUND

*Commitment Offense[2]*

In the early morning hours of March 1, 1983, Durant was awake after an argument with his girlfriend.  He awoke Stephanie about 2:00 a.m. to take her to the bathroom

---

[1]     Further statutory references are also to the Penal Code unless otherwise stated.

[2]     The summary of the commitment offense is taken primarily from the 1983 police report and probation report.

2

because she had a habit of wetting the bed. However, she had already wet the bed. He got clean clothes and laid Stephanie on the living room floor to change her. When she began whining, he spanked her.[3] When she began crying, he began hitting her. As she cried, he "lost it" and started punching her. Durant initially stated he did not remember how many times he hit Stephanie or where on her body he struck her. Later, however, he admitted hitting Stephanie at least 10 times. He hit her in the stomach with his fist and an open hand.

When Stephanie awakened her mother later that morning, Stephanie's lip was cut and there was blood in her vomit. Durant's girlfriend claimed she checked Stephanie that day and the next, but denied seeing any bruises other than a black eye. Durant told a psychiatrist Stephanie's stomach seemed tight when he touched it.

On the evening of March 2, 1983, almost two days after the beating, Durant's girlfriend called the San Diego Hotline asking where someone could go to get anonymous medical treatment and hung up when she learned there was no such place. Five minutes later, Durant called the hotline also asking about anonymous medical help for a sick child who had been throwing up for two days and who had a swollen stomach. When the operator said the child should go to the hospital because her appendix might have ruptured, he asked, "What if it's child abuse?" Durant then gave his name and promised to take Stephanie to the hospital.

---

[3]    When the investigating detective asked Durant why Stephanie would cry when he got her up to the bathroom, he replied, "Well sometimes I'm one way and sometimes I'm another. I guess she was scared."

When Durant and his girlfriend brought Stephanie to the emergency room, Stephanie's stomach was distended and she was in a lot of pain. She had a cut on her chin and a swollen lip. She also had a black left eye and purple bruising to her right ear. Her lip was swollen. While being treated, whenever Stephanie heard a male voice, she would say, "Oh, oh, daddy's here." When a nurse touched Stephanie, she cried, "Don't hit me!" After the nurse assured her they would not hurt her, Stephanie commented, "Mommy and Daddy hit me but they are always sorry."

During emergency surgery, Stephanie was found to have two perforations of her intestines caused by a blow to the stomach with a fist or foot. She also had an old perforation indicating a prior similar injury. There were multiple areas of chronically scarred tissue with micro-abscesses in the abdominal cavity. Because of the most recent intestinal perforation, fecal material from her bowel had spilled into and contaminated the entire abdominal cavity leading to fecal peritonitis. A large portion of her intestine was removed. However, Stephanie died a few hours later.

In addition to the abdominal injuries, an autopsy showed Stephanie had numerous bruises covering her entire head, chest, back, buttocks and legs. These injuries were inflicted within 48 hours of her hospitalization. Additionally, she previously suffered four broken ribs. Medical experts concluded all of the injuries were deliberately inflicted and were so severe an adult of average strength would have had to use almost all of his or her force to cause such damage.

When a police detective contacted Durant at the hospital, he was "visibly shaken and upset." When asked how many times he had struck Stephanie other than a simple

4

spanking, he said, "More than enough times."  He stated he would hit her for wetting the bed and admitted he had been going " 'overboard' with physical discipline for about the last year and a half."  He used to spank her, but then started hitting her all over her body.  He also admitted hitting her in the stomach with his fist three to six months before the incident.

*Witness Accounts of Abuse*

One of Stephanie's sisters reported Durant hit Stephanie and Stephanie's two sisters with a belt and a wire coat hanger.  The sister also said Durant gave her a black eye when he kicked her in the eye.  She reported Durant gave her mother a black eye when she tried to intervene when Durant was hitting Stephanie.

Neighbors reported seeing the children with bruises, especially Stephanie, who was described as always having bruises.  One neighbor reported seeing Stephanie with a blood-red eye in October 1981 and a bruised chin and ear.  Stephanie and her sisters told the neighbor Stephanie got the injuries from Durant beating her.  The neighbor also recalled seeing Stephanie's mother with a black eye and the girls told the neighbor Durant hit their mother when she tried to stop him from hitting Stephanie.  The same neighbor recalled Stephanie had a bowel problem eight months before her death.

Stephanie's grandfather reported he knew Durant was beating Stephanie for about a year or a year and a half before her death.  He recalled once seeing a large bruise on the left side of Stephanie's jaw and it looked like the jaw was crooked.  He also noticed bruises on her buttocks and legs.  Another time, Stephanie's right eye was blood red.

5

When the grandfather's wife questioned Stephanie's mother about why she did not do anything about the beatings, Stephanie's mother said she was afraid of Durant.

*Durant's Versions of Events*

A

In a 1983 declaration, apparently submitted for sentencing, Durant stated he was watching television in the early morning of March 1, 1983, when Stephanie began to cry. He discovered she had wet her bed and she was upset. Durant stated he "began to feel a loss of my thought process." He felt himself losing control. He started to spank Stephanie "and then things became like a dream. I hit her with my fist." He admitted striking her numerous times, but did not recall exactly how many times. He changed her wet clothes and put her back to bed.

He stated he did not see her again until the evening of March 2, 1983, when his girlfriend said Stephanie was still sick. Stephanie vomited when he tried to give her soup. He realized she was hurt and it was his fault. They made two phone calls for medical advice and took her to the emergency room as directed.

Durant stated, "the only child I have had trouble using control with was Stephanie." He stated he was depressed, bored and had a hard time finding work and "Stephanie was the focus of all my frustrations and anger." He stated he never wanted to hurt her and "always felt sick after I hit her." He stated he was prepared to go to jail and requested counseling.

B

In a 1990 psychiatric evaluation, Durant stated he was drinking heavily and watching television when Stephanie came out of her room whimpering with "messed pants." "He told her to come to him and he spanked her, thinking that she was old enough to go to the bathroom if she needed to." He admitted he had struck her a number of times before. He stated he went fishing the next day and came home to find his girlfriend upset about Stephanie's status. He stated they then called the crisis center for confidential medical care. At a 1995 parole hearing, Durant denied he had beaten the other children.

C

In 2009, Durant described the events of the crime relatively consistently with the official version of events, but the psychologist noted several differences. Durant said about 20 hours elapsed between when the incident of abuse occurred and when he sought medical help, whereas the official version indicated two days passed. Durant also said he abused Stephanie for only four months whereas he previously told police the abuse occurred over 18 months. Finally, Durant denied physical abuse of Stephanie's mother. He denied giving her a black eye, but acknowledged pushing her.

At the 2009 parole hearing, Durant declined to discuss the specifics of the crime. He did admit for the first time, however, to being abusive to all the children and their mother. He did not believe he hit Stephanie's sisters with a closed fist, but he "spanked them too hard" and slapped their faces. He also admitted to being emotionally and verbally abusive.

7

D

In the 2012 subsequent risk assessment, Durant was questioned about the discrepancies between his version of events and those of the official record. Durant stated once he came home and saw Stephanie was severely hurt and complaining of her stomach hurting, it took him 20 to 24 hours (rather than two days) to seek help. He took her to the hospital one hour after calling the medical hotline for anonymous medical help. Durant also changed his position regarding the length of time he abused Stephanie saying he abused her for at least a year, noting his view about what constituted physical abuse has changed. "He now views his pattern of spanking in the initial months as abuse and he acknowledges that the spanking intensified in severity up until her death." Durant remained steadfast in his denial of ever giving Stephanie's mother a black eye.

*Pre-Conviction History, Post-Conviction History, and Parole Plans*

Durant grew up in Escondido, California in an intact family. His father drank heavily and was physically abusive to Durant and his brother. Durant's father would hit or slap him, make him stand at attention and kick him in the shins or would have him touch his toes for long periods of time. The father would also kick Durant in the groin as he was bent over.

Durant left home at the age of 16 and moved in with his girlfriend who was 25 and had three daughters from a previous relationship, including Stephanie. Durant and his girlfriend had two sons together.

Durant had no prior juvenile or adult criminal record other than the incident for which he is currently incarcerated. Durant's conduct in prison has been largely

8

exemplary. He obtained his GED in 1985 and has taken some college courses. He has a number of positive chronos[4] reflecting his programming. Durant has been free of any serious discipline since 1996 when he took a battery out of a smoke detector that went off while his wife was cooking during a visit. He had a few custodial counseling chronos, the last being in 1999 for excessive contact during a visit.

*Psychological Evaluations*

A

A psychiatric evaluation of Durant in 1983 described Durant as representing "a tragic but classical syndrome of a young man who was moderately to severely abused as a youngster and grew up anxious and depressed." Because of his own childhood, Durant's "repertoire for dealing with children is very limited" and even though he vowed he would never abuse his own children he was "incapable of dealing adaptively" with Stephanie. He "perceived her lack of bladder control as a challenge to his authority." The psychiatrist recommended Durant be provided structured treatment for the length of his incarceration. The psychiatrist noted Durant's criminality involved his inability to deal with his impulses toward his own children and he would only act out again toward children "if he were in intimate contact with them in a family situation."

---

4     "A 'chrono' is an institutional documentation of information about inmates and inmate behavior." (*In re Stoneroad* (2013) 215 Cal.App.4th 596, 606, fn. 4.)

9

B

In 1986, Durant had his initial psychiatric evaluation for the Board of Prison Terms. The psychiatrist noted Durant's understanding of the crime was still limited. Beyond being aware that abused children often turn into abusive parents, Durant still could not "believe entirely what he did" and believed he would be "extremely unlikely to do this in the future." The psychiatrist noted Durant seemed to have grown up in the prior three years and felt Durant's programming was satisfactory. However, he thought Durant should actively seek Alcoholics Anonymous and self-understanding groups "since the pattern within his family of a juncture of alcoholism and physical violence is very well established."

C

A 1990 psychiatric evaluation concluded Durant had "just begun to explore the reasons behind the crime." He was diagnosed with intermittent explosive disorder as well as alcohol and cannabis dependence and passive aggressive personality disorder. After completing all available psychological programs, the psychiatrist recommended "one-to-one therapy to tease out all of the various reasons behind his committing this crime so that he can develop the necessary restraints that he needs to live around children in the future."

D

A 1994 psychiatric evaluation noted Durant had completed a considerable amount of group psychotherapy and was ready for individual therapy "to assure that he has explored and mastered all the causative factors pertaining to his offense." The

10

psychiatrist recommended he continue in his present rehabilitation program and, at the end of his individual therapy, Durant should be referred for an extensive evaluation program to evaluate his dangerousness. Similarly, in 1995, a psychiatrist noted Durant had ample opportunity to investigate his behavior and to think about ways to gain more control, but recommended individual therapy.

## E

By 1998, an evaluating psychiatrist thought Durant's explosive disorder was resolved since he had been in no fights during his incarceration. The psychiatrist found no mental health disorder requiring treatment, but stated abstinence, monitoring and attendance at self-help groups such as Alcoholics Anonymous should be mandatory conditions of parole.

## F

According to a 2006 psychological evaluation, Durant exhibited no depressive or psychotic symptoms and did not need mental health treatment. In response to the Board's inquiry about the extent to which Durant had "explored the commitment offense and come to terms with the underlying causes," the psychiatrist noted Durant never attempted to excuse his crime by referring to his own physical abuse or drug use. "This posture and assumption of personal responsibility is 'worth its weight in gold' and indicates a psychological state of mind that obviates the need for any psychotherapy."

## G

In the 2009 comprehensive risk assessment, the evaluating psychologist noted Durant took responsibility for Stephanie's fatal injuries, but the psychologist expressed

11

concern about inconsistencies between his version of events and the official version and his apparent minimization of his abusiveness. He developed relatively good insight into the motivations behind the crime by linking his abuse of the children to his own abuse by his father. Durant stated he abused Stephanie more severely than the other children "because he 'identified with' her and 'related her to [him]self.' " He also recognized the contributing role alcohol played in the crime because it lowered his inhibitions and he "became 'more emotional as opposed to cognitive.' "

Durant knew Stephanie's sisters sent letters opposing his release. He felt " 'part of them is still stuck in 1983' " and he "would like them to be free . . . have some measure of healing . . . go on in their lives and prosper." Although Durant had contact with Stephanie's mother early in his incarceration, he no longer wanted contact with her because he " 'associates her with this atrocity,' and 'she contributed to [his] delinquency.' "

Although the psychologist assessed Durant's risk for future violence or recidivism as low, she expressed concern about his minimization: "This may suggest that Mr. Durant has not yet taken full responsibility for the extent and severity of his actions. Continued minimization and denial may prevent Mr. Durant from recognizing the warning signs of aggression in his relationships in the future."

H

In 2012, the evaluating psychologist's subsequent risk assessment noted Durant's good behavior, positive work and vocational training while incarcerated. It noted Durant's insight into the causative factors leading up to the commission of the life crime

12

appeared to have improved over the years. However, it also noted Durant's oldest son has had no contact with Durant since the son turned 18 because the son feels Durant has minimized the extent of the abuse inflicted on Stephanie over the years.

Durant explained he was 16 when he met Stephanie's mother, who was eight years older than he was. She had three daughters of her own. Initially, their relationship was "exciting" and "fun," but "reality quickly set in with parental and financial responsibilities, which were exacerbated by the fact that he had lost a job." He used alcohol and marijuana to "drown [his] inadequacies" and "used to 'cover up' his feelings of hurt, anger and unresolved issues with his father." Alcohol and marijuana "removed his sense of morality (behavioral disinhibition)."

Durant stated Stephanie endured the brunt of his anger because he "overly identified her as being similar to himself in the sense that they were both third in line in birth order." Stating he now understands beating with a belt or coat hanger constitutes abuse, Durant acknowledged he abused Stephanie's two sisters, but not to the same extent as Stephanie. He also acknowledged they were victimized emotionally because he raised his voice.

The supplemental assessment noted Durant had remained on a steady course since his assessment in 2009 and expanded his relapse prevention plan. It commended Durant for his exemplary prison record and for making "positive strides in all possible realms . . . all of which serve as continued factors of mitigation reducing his risk of violent recidivism."

13

The assessment stated, "[w]hile there are no concerns about the presence of new risk factors that would elevate or aggravate his overall risk to violently re-offend, Mr. Durant would likely benefit from continued exploration into the reasons for his discrepant reports of important facts related to [the] life crime. [His] recent revisions in his version of events to more closely replicate those in the official record may be an attempt to placate the Board if questions were to arise (declined to talk about the specifics of the crime in the last hearing dated 9/9/09)." The assessment went on to say he appears to have a good understanding of the causative factors of how the abuse began and how it was maintained. However, it also stated, "Mr. Durant should take a more explorative look into the cycle of abuse which typically begins with verbal abuse and threats, followed by a period of remorse and normalcy and then a buildup of tension and frustration that in this case led to serious incidents of emotional and physical abuse of three children; one who ultimately died. An understanding of such will decrease the likelihood that he will act similarly in the future when faced with the personal and relational stressors."

*Objections to Parole by District Attorney and Victim's Family*[5]

Stephanie's sisters previously wrote letters in opposition to Durant's parole, although they were not referenced in the 2012 hearing. Durant sent letters of apology

---

[5]    The district attorney's and the family's opinions are not evidence of unsuitability for parole, but may influence the weight the Board or the Governor gives to the evidence. (*In re Vicks* (2013) 56 Cal.4th 274, 308-309 (*Vicks*); *In re Dannenberg* (2009) 173 Cal.App.4th 237, 255, fn. 5; *In re Weider* (2006) 145 Cal.App.4th 570, 590.)

14

through the Office of Victim and Survivor Rights and Services to Stephanie's sisters and his former girlfriend in the weeks before the 2012 hearing.

The deputy district attorney objected to Durant's parole arguing he was unsuitable for parole based not only on the cruel and callous manner of the crime, which caused the three-year-old victim to suffer a long and agonizing death, but also because Durant had not sufficiently demonstrated insight and remorse. Additionally, the deputy district attorney argued Durant had not "sufficiently participated in beneficial and appropriately directed self-help or therapy." Finally, the deputy district attorney argued the discrepancies in Durant's various accounts of the crime showed he was minimizing the duration of abuse as well as the scope of abuse of the other family members.

*Board's Decision*

In August 2012 the Board concluded Durant was suitable for parole and would not pose an unreasonable risk of danger to society or threat to public safety if released from prison. Although recognizing the despicable nature of the crime, the Board concluded Durant had changed and he had established circumstances of suitability for parole. The Board imposed several conditions for parole: (1) no use or possession of alcohol; (2) submission to anti-narcotic testing; (3) participation in a substance abuse program; (4) report to the parole outpatient clinic for evaluation; (5) and no unsupervised contact with children under the age of 12.

*Governor's Reversal*

In January 2013 the Governor reversed the Board's grant of parole. Although the Governor acknowledged Durant made efforts to improve himself while incarcerated and

15

commended him for taking positive steps, the Governor determined those efforts were outweighed by negative factors indicating Durant remains unsuitable for parole.

Citing *In re Lawrence* (2008) 44 Cal.4th 1181, 1214 (*Lawrence*), the Governor noted the circumstance of the crime "can provide evidence of current dangerousness when the record also establishes that something in the inmate's pre- or post-incarceration history, or the inmate's current demeanor and mental state, indicate that the circumstances of the crime remain probative of current dangerousness." The Governor noted the appalling nature of the crime against three-year-old Stephanie and the fact this was not a one-time occurrence, but was the culmination of years of brutal abuse of Stephanie as well as her mother and two sisters. The Governor concluded the evidence showed a callous disregard for their suffering.

In addition, the Governor expressed his concern Durant "has not fully realized or resolved his reasons for brutally beating Stephanie for two years and ultimately murdering her" even though Durant has recently gained a better understanding of his actions. The Governor noted Durant minimized aspects of the crime and his physical abuse in 2009 and continued to do so in 2012, even though his version of the events now more closely mirrored the official record. The Governor also expressed concern about lack of insight regarding the abuse that led up to Stephanie's death. The Governor observed in the years leading up to the final incident, "Stephanie was not just 'spanked'— she was violently attacked, repeatedly beaten with a closed fist, given a black eye and bruised face as a one or two-year-old, and had four ribs broken and a perforated intestine in the months before the murder. The injuries that led to Stephanie's death required Mr.

16

Durant to expend almost all of his strength and energy to inflict such damage." The Governor found Durant had not convincingly explained "how it is he could lash out so violently against a toddler, and continue doing so for the next two years." The Governor found the explanation for singling Stephanie out for abuse because they were both "third in line in the birth order" to make little sense. The Governor also expressed concern Durant denied giving the mother a black eye despite corroboration by witnesses.

The Governor agreed with the psychologist's recommendation in 2012 "that Durant 'take a more explorative look into the cycle of abuse which typically begins with verbal abuse and threats, followed by a period of remorse and normalcy and then a buildup of tension and frustration that in this case led to serious incidents of emotional and physical abuse of three children; one of who ultimately died. An understanding of such will decrease the likelihood that he will act similarly in the future when faced with the personal and relational stressors.' " Observing Durant had not taken domestic violence or parenting classes, the Governor encouraged him to explore the causes of his explosive rage and violence against his former girlfriend and daughters and to "develop the coping skills necessary to handle familial stresses in the community."

Considering all relevant evidence in the record as a whole, the Governor found Durant currently poses a danger to society if released from prison. As a result, the Governor reversed the Board's decision to grant Durant parole.

*Trial Court's Grant of Petition for Writ of Habeas Corpus*

Durant challenged the Governor's decision by filing a petition for writ of habeas corpus with the superior court. The trial court granted Durant's petition for habeas relief

17

finding, based on its review of the record, the Governor's decision Durant is unsuitable for parole "was based on guesses and irrational speculation rather than rational inferences based on the facts presented." In response to the Governor's decision Durant is "currently dangerous because he has 'not fully realized or resolved his reasons for brutally beating Stephanie for two years and ultimately murdering her,' " the court stated the Governor's decision did not include "a factually identifiable deficiency in perception and understanding, much less one that tends to show that Durant currently poses an unreasonable risk of danger." The court also took issue with the Governor's statement, " 'Mr. Durant does not convincingly explain how it is he could lash out so violently against a toddler.' " Instead, the court concluded Durant had "repeatedly explained how he came to that point in a way that was convincing to numerous psychological evaluators and [the Board]."

DISCUSSION

I

*Guiding Legal Principles and Standard of Review*

"[T]he fundamental consideration in parole decisions is public safety." (*In re Lawrence*, *supra*, 44 Cal.4th at p. 1205.) The decision whether to grant parole is an inherently subjective determination. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 655 (*Rosenkrantz*).) The Board and the Governor must consider "[a]ll relevant, reliable information available" (Cal. Code Regs., tit. 15, § 2402, subd. (b)) and the decision is guided by the factors identified in section 3041 and the Board's regulations. Among these factors are the nature of the commitment offense, including the inmate's behavior

18

before, during, and after the crime, as well as the inmate's social history, mental state, criminal record, attitude towards the crime, and parole plans. (Cal. Code Regs., tit. 15, §§ 2281, subd. (b), 2402, subd. (b).)

Circumstances tending to show suitability for parole include the inmate: (1) lacks a juvenile history of violent or potentially violent behavior; (2) has a history of reasonably stable social relationships; (3) has demonstrated remorse and an understanding of the nature and magnitude of the offense; (4) lacks a significant history of violent crime; (5) has a reduced recidivism risk because of age; (6) has realistic parole plans; and (7) has participated in institutional activities demonstrating an enhanced ability to function if paroled. (Cal. Code Regs., tit. 15, § 2402, subd. (d).) Conversely, circumstances tending to show unsuitability for parole include the inmate: (1) committed the offense in a particularly heinous, atrocious, or cruel manner; (2) possesses a previous record of violence; (3) has an unstable social history; (4) has previously sexually assaulted another individual in a sadistic manner; (5) has a lengthy history of severe mental problems related to the offense; and (6) has engaged in serious misconduct while in prison. (*Id.*, § 2402, subd. (c).)

These circumstances provide general guidelines. The importance attached to any circumstance or combination of circumstances in a given case is left to the Board's or the Governor's sound judgment. (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 654.) "It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." (*In re Lawrence, supra,* 44 Cal.4th at

p. 1212.) Consequently, a factor that might not by itself establish an inmate's unsuitability for parole may still contribute to a finding of unsuitability. (Cal. Code Regs., tit. 15, § 2402, subd. (b).)

When the Board finds an inmate convicted of murder suitable for parole, the Governor may conduct an independent review of the entire record to determine whether the inmate currently poses a threat to public safety. (Cal. Const., art. V, § 8, subd. (b); § 3041.2; *In re Shaputis* (2011) 53 Cal.4th 192, 215, 220-221 (*Shaputis II*).) The "Governor has discretion to be 'more stringent or cautious' in determining whether a defendant poses an unreasonable risk to public safety." (*In re Lawrence*, *supra*, 44 Cal.4th at p. 1204.)

We independently review the record from a superior court order granting relief on a petition for habeas corpus based on documentary evidence. (*In re Lazor* (2009) 172 Cal.App.4th 1185, 1192.) However, our power to review the Governor's decision is limited. As long as the Governor's decision reflects due consideration of the specified factors as applied to the individual inmate in accordance with applicable legal standards, our review is restricted to ascertaining whether there is some evidence in the record to support the Governor's decision the inmate poses a current threat to public safety. (*Lawrence*, *supra*, 44 Cal.4th at p. 1212; *Rosenkrantz*, *supra*, 29 Cal.4th at p. 677.)

The " 'some evidence' standard is *more deferential* than substantial evidence review, and may be satisfied by a lesser evidentiary showing." (*Shaputis II, supra,* 53 Cal.4th at p. 210.) "Some evidence" in this context means only a modicum of evidence. "Resolution of any conflicts in the evidence and the weight to be given the evidence are

20

matters within the authority of [the Board or] the Governor. . . . [T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of [the Board or] the Governor." "As long as the . . . decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the . . . decision.' " (*Ibid*.)

"Only when the evidence reflecting the inmate's present risk to public safety leads to but one conclusion may a court overturn a contrary decision by the Board or the Governor. In that circumstance the denial of parole is arbitrary and capricious, and amounts to a denial of due process." (*Shaputis II, supra,* 53 Cal.4th at p. 211.)

II

*The Governor's Decision is Supported by Some Evidence*

Here, the trial court improperly reweighed the evidence rather than reviewing the record to determine if a modicum of evidence supported the Governor's decision. "It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole." (*In re Shaputis* (2008) 44 Cal.4th 1241, 1260 (*Shaputis I*).)

The Governor in this case considered the evidence in the record and concluded Durant is unsuitable for parole because he remains a danger to society if released from prison. The Governor based his decision partially on the appalling nature of the commitment offense.

21

The circumstances of the commitment offense are an appropriate consideration in determining parole suitability. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).) Among the signs of an especially heinous commitment offense are: "[t]he victim was abused, defiled or mutilated during or after the offense"; "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering"; and "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1)(C)-(E).) Each of these signs is present in this case.

The Governor cited a medical expert's opinion it would have required an adult of average strength to use of all his force to inflict the intestinal perforation and extensive bruising found on Stephanie's body at the time of her death. Stephanie "suffered and vomited for two days before she was taken to the hospital." The Governor found it senseless a three-year-old girl "would suffer this violence because she wet the bed."

The Governor also observed this was not a one-time occurrence. Durant admitted going "overboard" with physical punishment of Stephanie for 18 months. Durant admitted striking her before in the stomach. This is supported by the record. According to the medical expert, Stephanie had evidence of prior rib fractures and a prior bowel perforation. She would have been obviously severely ill and would have suffered severe abdominal pain, distension and vomiting on the prior occasion. If she had been treated then, she would have stood a better chance of surviving the final instance of abuse.

Durant beat all three sisters with a belt or a wire coat hanger any time they would wet their pants. The girlfriend reported Durant hit her at least four times. Neighbors

22

reported often seeing bruises on the children and the girlfriend. One neighbor saw Stephanie with a blood-red eye, bruised chin and bruised ear almost a year and a half before Stephanie's death. At the same time, the girlfriend had a black eye. The girls told the neighbor their mother got the black eye from Durant when she tried to stop him from beating Stephanie.

Based on the record, the Governor concluded "Durant's repeated violence and abuse against Stephanie, [the girlfriend], and the other girls, culminating in the brutal murder of Stephanie, demonstrates a callous disregard for their suffering." We, therefore, have no difficulty concluding there is at least a modicum of evidence to support the Governor's characterization of the circumstances of the commitment offense as appalling or heinous.

In addition to the nature of the crime, the Governor determined Durant still lacked insight. "While it appears that Mr. Durant has recently gained a better understanding of his actions, I am concerned that Mr. Durant has not fully realized or resolved his reasons for brutally beating Stephanie for two years and ultimately murdering her."

An inmate's acceptance of responsibility and development of insight are also appropriate considerations in determining parole suitability. (Cal. Code Regs., tit. 15, § 2402, subd. (d)(3); *Shaputis I, supra,* 44 Cal.4th at p. 1246.) An inmate's lack of insight into and understanding of the behavior underlying the commitment offense can support a conclusion the inmate is currently dangerous. (*Shaputis I*, at p. 1260.)

Expressions of remorse and demonstration of insight will vary from inmate to inmate and there are no special words for an inmate to articulate in order to communicate

he or she has committed to ending a previous pattern of violent or antisocial behavior. (*Shaputis I*, *supra*, 44 Cal.4th at p. 1260, fn. 18.) However, the Supreme Court has recognized "the presence or absence of insight is a significant factor in determining whether there is a 'rational nexus' between the inmate's dangerous past behavior and the threat the inmate currently poses to public safety." (*Shaputis II*, *supra*, 53 Cal.4th at p. 218.)

Although Durant acknowledged responsibility and has articulated remorse for his crime, his version of events and his characterization of abuse have changed over time. The Governor noted, "Durant minimized aspects of his crime and his physical abuse" of Stephanie's mother and the three daughters in 2009. Durant described becoming physically abusive only four months before the final beating of Stephanie and stated he abused Stephanie more because he "identified with her" as the third child. He denied giving the mother a black eye and only acknowledged "pushing her."

The Governor recognized Durant admitted in the 2012 supplemental assessment he abused Stephanie for "at least a year" and recognized hitting the girls with a belt or a wire coat hanger constituted abuse.[6] Durant related he was physically abused by an alcoholic father and "practiced what he learned." He admitted using alcohol and marijuana to "drown out his inadequacies" and used anger to " 'cover up' his feelings of hurt, anger, and unresolved issues with his father." As a result, he stated he found himself hitting Stephanie too hard. He recognized "his pattern of spanking Stephanie in

---

[6]    In 2009, Durant admitted he abused the other girls, but said only he spanked them too hard, slapped them in the face, and was verbally abusive.

the initial months as abuse" and acknowledged "that the 'spanking intensified in severity up until her death.' "

However, the Governor found Durant's 2012 explanations still minimized the abuse. The Governor observed, "Stephanie was not just 'spanked'—she was violently attacked, repeatedly beaten with a closed fist, given a black eye and bruised face as a one or two-year-old, and had four ribs broken and a perforated intestine in the months before the murder. The injuries that led to Stephanie's death required Mr. Durant to expend almost all of his strength and energy to inflict such damage." These observations are amply supported by the record in this case.

The Governor found Durant had not convincingly explained, "how it is he could lash out so violently against a toddler, and continue doing so for the next two years." Additionally, the Governor found the explanation for singling Stephanie out for abuse because they were both "third in line in the birth order" to make little sense. The Governor also expressed concern Durant continued to deny giving the mother a black eye despite corroboration by witnesses.

The trial court improperly discounted the Governor's conclusion about Durant's lack of insight saying Durant "repeatedly explained how he came to that point in a way that was convincing to numerous psychological evaluators and [the Board]." Based on our independent review, we conclude this is an overstatement of the psychological evaluations. Furthermore, it is not for the reviewing court "to decide *which* evidence in the record is convincing." (*Shaputis II*, *supra*, 53 Cal.4th at p. 211.) That determination is for the executive.

25

There is more than a modicum of evidence in the record to support the Governor's conclusion. The 2012 evaluator noted Durant's "recent revisions in his version of events to more closely replicate those in the official record may be an attempt to placate the Board if questions were to arise."[7] Additionally, although the 2012 evaluator acknowledged Durant "appear[ed] to have a good understanding into the causative factors" related to the abuse, the evaluator did not state she was convinced. Indeed, she recommended "Durant should take a more explorative look into the cycle of abuse which typically begins with verbal abuse and threats, followed by a period of remorse and normalcy and then a buildup of tension and frustration that in this case led to serious incidents of emotional and physical abuse of three children; one who ultimately died. *An understanding of such will decrease the likelihood that he will act similarly in the future when faced with the personal and relational stressors*." (Italics added.)

The Governor agreed with the 2012 evaluator's recommendation Durant develop further insight, which provides a " 'rational nexus' between the inmate's dangerous past behavior and the threat the inmate currently poses to public safety." (*Shaputis II*, *supra*, 53 Cal.4th at p. 218.) Observing Durant had not taken domestic violence or parenting classes, the Governor encouraged him to explore the causes of his explosive rage and violence against his former girlfriend and daughters and to "develop the coping skills necessary to handle familial stresses in the community."

---

[7]     "It is true that often the most recent evidence as to the inmate's level of insight will be particularly probative on the question of the inmate's present dangerousness, but that is not *necessarily* the case. If the newest evidence is unreliable or insubstantial, the parole authority is not bound to accept it." (*Shaputis II*, *supra*, 53 Cal.4th at p. 211.)

Durant contends no domestic violence programming was made available to him so he engaged in other self-help programming during his incarceration and read a couple of books related to parenting and/or domestic violence. Durant provided, as late submissions to the Board for the 2012 hearing, a few undated book reports generally touching on the topics of alcoholism, parenting and personal insight. Durant does not point to evidence in the record showing domestic violence or parenting programming was never available to him throughout his nearly 30 years in prison. The weight the Governor gave to the programming Durant has participated in is within the Governor's discretion. (*Shaputis II*, *supra*, 53 Cal.4th at p. 218.) It was reasonable for the Governor to conclude Durant's minimal self-study in the areas specifically connected to the crime in the weeks leading up to his latest parole hearing were insufficient to prevent further violence. (*In re Shippman* (2010) 185 Cal.App.4th 446, 461 [reasonable for Board to conclude participation in minimal self-help programs were " 'building block[s],' which would need to be expanded upon before [inmate] can develop the necessary skills to prevent further violence]; *In re Van Houten* (2004) 116 Cal.App.4th 339, 356 [need for further psychological treatment or programming is a factor to consider in evaluating dangerousness].)

Based on our independent review of the record, we conclude there is at least a modicum of evidence to support the Governor's conclusion Durant remains unsuitable for parole.

27

III

*Individualized Consideration of Parole Suitability Circumstances*

Durant contends the Governor failed to give him individual consideration of the circumstances bearing on parole suitability and, therefore, denied him due process. We are not persuaded.

"While the Governor is required to engage in ' "an individualized consideration of the specified criteria" ' (*Lawrence*, *supra*, 44 Cal.4th at p. 1205), it has never been held that the Governor's decision must address individually each factor in section 2042 of title 15 of the California Code of Regulations." (*In re LeBlanc* (2014) 226 Cal.App.4th 452, 458.) Further, the Governor is not required to describe the "exact or relative weight given any particular circumstance." (*In re Stevenson* (2013) 213 Cal.App.4th 841, 862.) The Governor's decision states he considered the evidence in the record relevant to whether Durant is currently dangerous. We have no reason to doubt his statement. (*In re Butler* (2014) 231 Cal.App.4th 1521, 1535.)

DISPOSITION

The order granting habeas corpus relief is reversed and the trial court is directed to enter a new order denying such relief. Upon finality of this decision, the stay issued on October 1, 2014, is dissolved.

McCONNELL, P. J.

WE CONCUR:

NARES, J.

O'ROURKE, J.